Argued and submitted May 18, at N. Medford High School, Medford, Oregon, decision of Court of Appeals affirmed; order of Land Use Board of Appeals reversed November 18, 2010

Wendy SIPOREN,
*Petitioner,*

*and*

Ivend HOLEN
and Medford Citizens for Responsible Development,
*Petitioners on Review,*

*v.*

CITY OF MEDFORD
and Wal-Mart Stores, Inc.,
*Respondents on Review.*

(LUBA 2008185; CA A142541; SC S058025)

243 P3d 776

Kenneth D. Holm, Beaverton, argued the cause and filed the brief for petitioners on review.

John R. Huttl, City Attorney's Office, Medford, argued the cause and filed the brief for respondent on review City of Medford.

Gregory S. Hathaway, of Davis Wright Tremaine, LLP, Portland, argued the cause and filed the brief for respondent on review Wal-Mart Stores, Inc. With him on the brief was E. Michael Connors.

Peter A. Kasting, Chief Deputy City Attorney, Office of City Attorney, Portland, and Sandra N. Duffy, Multnomah County Counsel's Office, Portland, filed the joint brief for *amici curiae* League of Oregon Cities and Association of Oregon Counties.

GILLETTE, J.

## GILLETTE, J.

The subject of this land use case is a decision by the Medford City Council approving a "site plan and architectural review" application for a large store that Wal-Mart Stores, Inc., proposes to build within the city's boundaries. Certain individual citizens of Medford and a citizens' group, Medford Citizens for Responsible Development (collectively, petitioners) appealed the city's decision to the Land Use Board of Appeals (LUBA), arguing that Wal-Mart's application did not comply with certain provisions of the Medford Land Development Code (MLDC), which (in petitioners' view) required Wal-Mart to comprehensively address the traffic impacts of the proposed development as a condition for obtaining site plan and architectural review approval. Wal-Mart responded that, under the city's interpretation of the MLDC, the provisions on which petitioners relied did not apply to site plan and architectural review decisions. LUBA sustained petitioners' claim of error and remanded the matter for further proceedings. *Siporen v. City of Medford*, 59 Or LUBA 78 (2009). Wal-Mart sought judicial review of that decision in the Court of Appeals. That court reversed LUBA's decision, holding that the city's interpretation of the relevant MLDC provisions was plausible and that LUBA and the Court of Appeals therefore were required to accept that interpretation for purposes of review. *Siporen v. City of Medford*, 231 Or App 585, 220 P3d 427 (2009). We allowed petitioners' request for review and now affirm the decision of the Court of Appeals.

As noted, the controversy in this case arose out of Wal-Mart's proposal to build a large store in an area of Medford that is zoned for such retail/commercial uses. To obtain a permit to build the store, Wal-Mart was required to obtain certain "plan authorizations,"[1] including approval of

---

[1] Under the MLDC, a prospective developer cannot build on or otherwise develop land until the developer obtains a "development permit," which is a "comprehensive permit, running with the land, setting forth the general procedural policies and improvement requirements necessary for the development of a specific property." MLDC 10.101. When a prospective developer applies for a development permit, the Medford planning department must determine which of 13 potentially applicable "plan authorizations" must be obtained prior to the permit's issuance. *Id.* The developer may request any or all of the required plan authorizations from

an application for "site plan and architectural review." Wal-Mart submitted an application for site plan and architectural review, which contained information required for such applications under the relevant provisions of the code,[2] to the body authorized to review such applicationsthe Site Plan and Architectural Review Commission (SPAC). Wal-Mart attached to its application a Traffic Impact Analysis (TIA) that dealt with the ingress and egress points for the proposed store's parking areas, but not with the impact its development might have on nearby arterial and collector streets. The limited TIA apparently had originally been submitted in response to earlier decisions by LUBA with respect to Wal-Mart's application for site plan and architectural review of an earlier proposal to build a slightly larger store in Medford.[3]

In the ensuing proceeding before SPAC, petitioners argued that, as part of the site plan and architectural review process, Wal-Mart was required to submit a comprehensive

---

the appropriate approving authority at any time thereafter and, "[u]pon satisfactory completion of all conditions required of the plan authorizations, as identified on the development permit application, a development permit shall be issued." *Id.*

A "plan authorization" is a "specific planning and development review process which sets forth specific conditions for development consistent with the policies, standards and criteria of the [Medford] Comprehensive Plan and [the MLDC]." MLDC 10.102. The MLDC lists and classifies the 13 different plan authorizations, MLDC 10.102, and designates which of five different "approving authorities" (the City Council, the Planning Council, the Site Plan and Architectural Commission, the Landmarks and Historic Preservation Commission, and the Planning Director), is authorized to act on each of those plan authorizations. MLDC 10.110. Of particular relevance to the present case are the plan authorizations designated as "Site Plan and Architectural Review" (for which the Site Plan and Architectural Review Commission (SPAC) is the approving authority, MLDC 10.132), and "Zone Changes" (for which the Planning Commission is the approving authority, MLDC 10.122).

[2] The relevant provision, MLDC 10.287, requires applicants to submit, among other things, a landscape plan, architectural plans, stormwater plans, and a site plan showing lot dimension, all proposed and existing buildings and structures, yards and open space, walls and fences, any proposed off-street parking, points of ingress and egress, loading spaces, lighting, etc.

[3] The city's decision on that application had generated two appeals to LUBA and two remands from that body—*Wal-Mart Stores, Inc. v. City of Medford*, 49 Or LUBA 52 (2005), and *Siporen v. City of Medford*, 55 Or LUBA 29 (2007). The upshot of those remands was a direction to the city to either apply MLDC 10.462 (a provision of the development code requiring traffic impact analysis of certain proposed developments) to its review of Wal-Mart's site plan and architectural review application, or explain why that provision did not apply.

TIA and to show that its proposed development would not cause the "level of service" (LOS) on the roads surrounding the project to fall below a certain designated level—LOS level "D." Petitioners relied on three provisions of the development code, MLDC 10.460, MLDC 10.461, and MLDC 10.462, which appear in a section of the MLDC that pertains generally to "the establishment and application of development standards for public improvements," including streets. MLDC 10.007. The first of those provisions, MLDC 10.460, describes the function and purpose of a TIA in terms of "specifically identif[ying] the generation, distribution, and assignment of traffic to and from a proposed development" and "identify[ing] the traffic impacts that a proposed development will have on the existing and future street network." The second provision, MLDC 10.461, describes the process of determining the appropriate scope of a TIA and, as relevant here, when a TIA is required:

> "If a proposed application has the potential of generating more than 250 net average daily trips (ADT) or the Public Works Department has concerns due to the operation or accident history, a TIA will be required to evaluate development impacts to the transportation system. The Public Works Department may waive a TIA if it is concluded that the impacts are not substantial."

MLDC 10.461(3). The third provision cited by petitioners, MLDC 10.462, describes six potential levels of service (Levels A through F) for arterial and collector streets in terms of average speeds, delays, volume-to-capacity ratio and similar considerations, and then provides:

> "Whenever level of service is determined to be below level D for arterials or collectors, development is not permitted unless the developer makes the roadway or other improvements necessary to maintain level of service D respectively."

Petitioners took the position that, by their clear terms, the foregoing provisions are directed at analyzing and controlling the traffic impacts of proposed "development[s]." Petitioners argued that, because Wal-Mart's store construction proposal incontrovertibly was a proposed

"development,"[4] the TIA requirement at MLDC 10.461 and the LOS requirement at MLDC 10.462 therefore applied to it. Finally, petitioners argued that, as long as Wal-Mart failed to comply with those two requirements, SPAC could not lawfully approve Wal-Mart's site plan and architectural review application. That was so, in petitioners' view, because, under yet another MLDC provision, MLDC 10.290(2), SPAC must find that a proposed development "complies with the applicable provisions of all city ordinances" in order to approve a site plan and architectural review application.

SPAC rejected that analysis of the ordinances. It concluded that the TIA requirement at MLDC 10.461 and the level of traffic service requirement at MLDC 10.462 were not within SPAC's scope of authority as defined in other provisions of the MLDC and that, as such, those provisions were not "applicable provisions" that, under MLDC 10.290(2), SPAC was required to enforce through its site plan and architectural review process. SPAC observed that, for 20 years, the city had been interpreting the MLDC as placing authority over the subject matter of MLDC 10.461 and MLDC 10.462 solely in the *Planning* Commission and as requiring *that* agency, *at the time of any zone change*, to analyze the level of traffic service and ensure that the specific minimum level of traffic service would be maintained. SPAC concluded that, because zone change decisions regarding street capacity and adequacy are directed not only at the existing uses, but also at the *allowed* uses within a zone, the traffic issues relating to site development are dealt with as part of zoning decisions, rendering MLDC 10.461 and MLDC 10.462 inapplicable at the time of site development. Having thus explained its interpretation of the ordinances that petitioners had cited

---

[4] MLDC 10.012 defines the term "development," for purposes of the MLDC, as

"[t]he improvement of a parcel of land; including partitioning or subdividing of any improved or unimproved real property, for any purpose, and by any person, association, or other entity."

The same provision defines the term "developer" as

"[a] person, firm, corporation, partnership, syndicate, local agency, city, county, state or federal government or any district of or division thereof, who or which causes the development of real property and is the owner of record or owner under contract to purchase or lease for purposes of development, the real property to be developed or improved."

(including the city's conclusion that the TIA and level-of-traffic-service requirements were not applicable to site plan and architectural review), SPAC approved Wal-Mart's application without applying those requirements. The City Council affirmed that approval and adopted SPAC's reasoning.

Petitioners appealed the City Council's decision to LUBA. At the outset, LUBA observed that its focus was only on the *city's* interpretation of the MLDC, and that, under the relevant standard-of-review statute, ORS 197.829(1), it was required to affirm that interpretation unless it determined that it was inconsistent with the express language, purpose, or underlying policy of the MLDC.[5] *Siporen*, 59 Or LUBA at 85. LUBA went on to determine that MLDC 10.290(2) (requiring SPAC to limit approvals to applications that comply with all "applicable provisions") was *textually* ambiguous with respect to whether the two provisions upon which petitioners relied—MLDC 10.461 and MLDC 10.462—were "applicable." *Id.* at 86-87. But, after examining the contextual material that the city offered in support of its conclusion that those provisions were *not* "applicable"—specifically, various other provisions of the MLDC that, in the city's view, placed the requirements set out in MLDC 10.461 and MLDC 10.462 under the authority of the Planning Commission at the time of zone changes—LUBA concluded that the city's

---

[5] ORS 197.829 provides:

"(1) The Land Use Board of Appeals shall affirm a local government's interpretation of its comprehensive plan and land use regulations, unless the board determines that the local government's interpretation:

"(a) Is inconsistent with the express language of the comprehensive plan or land use regulation;

"(b) Is inconsistent with the purpose for the comprehensive plan or land use regulation;

"(c) Is inconsistent with the underlying policy that provides the basis for the comprehensive plan or land use regulation; or

"(d) Is contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements.

"(2) If a local government fails to interpret a provision of its comprehensive plan or land use regulations, or if such interpretation is inadequate for review, the board may make its own determination of whether the local government decision is correct."

The parties appear to agree that, in the present proceeding, the relevant portion of the statute is paragraph (1)(a).

interpretation was not sustainable, even under the deferential standard of review that it believed that it was required to use. *Id.* at 91-92. Accordingly, LUBA remanded the case to the city, stating that, if the city wished to approve the Wal-Mart proposal without applying the TIA and level-of-traffic-service requirements, it would have to amend MLDC 10.290(2). *Id.* at 93.

Wal-Mart and the city sought judicial review, arguing that LUBA had failed to apply the correct standard of review—*i.e.*, that it failed to acknowledge that the text of MLDC 10.290(2) is capable of supporting more than one interpretation, and that the city's reconciliation of conflicting provisions should be given deference.

In response to that argument, the Court of Appeals attempted to translate the statutory standard at ORS 197.829(1)(a) into terms that would be useful in reviewing the city's decision. The court began by observing that, under its own decision in *Foland v. Jackson County*, 215 Or App 157, 168 P3d 1238 (2007), the determination whether a local government's interpretation of its own ordinance was "inconsistent" with the express wording of the ordinance for purposes of ORS 197.829(1)(a) depends on

> " 'whether the interpretation is *plausible*, given the interpretive principles that ordinarily apply to the construction of ordinances under the rules of *PGE* [*v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993)].' "

*Siporen*, 231 Or App at 598 (quoting *Foland*, 215 Or App at 164) (emphasis added). The court then explained that that meant that LUBA's task, and its own, in reviewing LUBA's order,

> "is not to determine whether the city's interpretation of the code was 'correct' in some absolute sense of choosing among various plausible interpretations, but, instead, merely whether that interpretation satisfied *PGE*'s first level threshold of plausibility. If it does, then, under ORS 197.829(1)(a), LUBA should have, and we must, sustain that interpretation, even if another interpretation might be 'better' or more sensible or persuasive."

*Siporen*, 231 Or App at 598-99. Having assigned that meaning to the statutory standard of review, the court examined

petitioners' contention that the city's interpretation of the relevant MLDC provisions could not be reconciled with various other code provisions that petitioners believed were central to the issue. The court concluded that

> "[f]undamentally, because there is no code provision that expressly [addresses whether MLDC 10.462 is 'applicable'], the parties' arguments are entirely contextual and the code provisions on which either party relies do not foreclose the other party's interpretation. Notwithstanding that neither party's contentions fully harmonize all cited provisions of the city's code, both parties present plausible interpretations of the code. Under such circumstances, LUBA must affirm the city's interpretation."

*Id.* at 602.

Before this court, petitioners argue that the Court of Appeals is setting the analytical bar too low when it suggests that ORS 197.829(1) looks to the "plausibility" of a local government's interpretation:

> "According to the Court [of Appeals'] analysis, if the local government interpretation is plausible in isolation, then LUBA may not exercise its review authority to check the interpretation for consistency with the express language, purpose [or] policy of the local code. Furthermore, the Court's holding essentially forbids LUBA from considering countervailing arguments raised during the local land use proceedings."

Petitioners overstate the Court of Appeals' position. That court never suggested that LUBA is precluded from considering countervailing arguments or from checking the local government's interpretation for consistency with, among other things, the express wording of local ordinances. What the court *did* suggest is that, when both parties' interpretations necessarily are based on context, *i.e.*, the surrounding provisions, and the surrounding provisions are such that neither party's interpretation fully harmonizes them, then the fact that the opposing party can identify some part of the surrounding provisions with which the local government's interpretation does not easily fit does not mean that LUBA is excused from accepting the local government's interpretation in accordance with ORS 197.829(1). *Siporen*, 231 Or App at 602.

Petitioners respond that, when ORS 197.829(1)(a) speaks of a local government's interpretation being "inconsistent with the express language" of a land use regulation, it includes in that concept *any* incompatibility with *any* arguably relevant wording in the land use code. The logical outfall of that position is that the interpretive approach prescribed by ORS 197.829(1)(a) will apply to a local government's interpretation that is directed at a single ambiguous term or provision, but not to an interpretation that seeks to harmonize arguably conflicting terms or provisions within a land use code.[6]

We think that the approach to ORS 197.829(1)(a) that petitioners offer cannot be what the legislature intended. "Interpretation" of a body of regulations can occur at at least two levels: (1) an attempt to determine what was intended by a single ambiguous term or statement in a single provision; and (2) an attempt to determine what was intended when separate provisions within a body of regulations contain terms or statements that appear to conflict. In addition, those two levels of interpretation may intersect, as in the present case, when the parties' competing interpretations of a single term ("applicable") are informed by their interpretation of supposedly conflicting provisions elsewhere in the regulations.

■       There is every reason to believe that, when the legislature enacted ORS 197.829, it intended to impose the standard of review spelled out in the statute to both situations. Both fall within the ordinary meaning of the term "interpretation." Furthermore, the policy choice that ORS 197.829 reflects is relevant to both situations. In that regard, we note that ORS 197.829(1) is, in large part, a codification of this court's holding in *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992).[7] As *Clark* implied, 313 Or App at 515 (citing

---

[6] As the city puts it in its brief, in this latter situation,

"the very inconsistency among competing code sections which creates the ambiguity [that the governing body is attempting to resolve] also forms the 'inconsistency with the express language' which [in petitioners' view] supports the Board's or a court's rejection of the local government interpretation."

[7] ORS 197.829(1)(d), pertaining to review of local land use provisions that purport to implement state statutes or rules, is not drawn from the *Clark* decision. In *Clark*, this court considered LUBA's reversal of a conditional surface mining permit that had been issued by Jackson County. LUBA concluded that Jackson

and describing *Anderson v. Peden*, 284 Or 313, 587 P2d 59 (1978)), and as this court's decision in *Gage v. City of Portland*, 319 Or 308, 316-17, 877 P2d 1187 (1994), later spelled out, at least one of the fundamental ideas behind applying that standard is that, when a governing body is responsible for enacting an ordinance, it may be assumed to have a better understanding than LUBA or the courts of its intended meaning. We think that that assumption is equally relevant to a governing body's understanding of what, in the face of apparent inconsistencies, the governing body's intention was.

If a governing body's efforts at resolving conflicts in its land use code are "interpretations" that are entitled to the deference described in ORS 197.829(1) (and we conclude that they are), then we must discuss what it means for such an interpretation to be "inconsistent with the express language" of the code. Such an exercise frequently involves choosing among arguably inconsistent statements in a body of regulation, giving more force to some statements than to others.

Wal-Mart suggests that, in such circumstances, a local government's interpretation is not inconsistent with the express language "if it is supported by some express provisions in the * * * land use regulations." In other words, Wal-Mart reads ORS 197.829(1)(a) as requiring LUBA to affirm the local government's interpretation unless it finds

---

County was barred from issuing the permit by a county land use ordinance that limited conditional use permits to cases where the proposed use was to be situated on land that was "generally unsuitable" for agricultural purposes. LUBA rejected Jackson County's interpretation of the ordinance as focusing only on the portion of the land where the proposed use would occur, and concluded that "generally unsuitable land" must refer to the larger agricultural tract on which the portion at issue was located. Based on the LUBA review statute, *former* ORS 197.835(7)(a)(D) (now ORS 197.835(9)(a)(D)), and cases that referred to that statute, this court held that LUBA had exceeded its statutory scope of review by imposing on the county's ordinance an interpretation that LUBA preferred to the county's permissible interpretation. The *Clark* court held that

"LUBA is to affirm the county's interpretation of its own ordinance unless LUBA determines that the county's interpretation is inconsistent with the express language of the ordinance or its apparent purpose or policy. LUBA lacks authority to substitute its own interpretation of the ordinance unless the county's interpretation was inconsistent with that ordinance, including its context."

313 Or at 515. The resemblance of that holding to the wording of ORS 197.829(1)(a)-(c) is obvious.

that that interpretation is inconsistent with *all* the express wording in the body of regulations. That approach seems to accommodate the wording of the statute, but it is unsatisfying insofar as it does not require any explicit consideration of the potentially relevant but apparently competing provisions to determine the intent of the provisions as a whole. That concern is resolved, however, when we consider that a local government's stated position in these circumstances would hardly qualify as an "interpretation" of its own land use code unless it directly confronted the allegedly conflicting provisions and purported to make a choice between them or otherwise resolved the conflict. *Cf. Friends of Columbia Gorge v. Columbia River (S055722)*, 346 Or 366, 404-05, 213 P3d 1164 (2009) (court would not defer to Columbia River Gorge Commission's stated position that geological resources were not "natural resources" for purposes of commission's revision of its own management plan unless and until the commission took action that reflected a considered choice between two possible definitions of the term "natural resources").

■    Based on the foregoing analysis, we conclude that, when a local government plausibly interprets its own land use regulations by considering and then choosing between or harmonizing conflicting provisions, that interpretation must be affirmed, as held in *Clark* and provided in ORS 197.829(1)(a), unless the interpretation is inconsistent with *all* of the "express language" that is relevant to the interpretation, or inconsistent with the purposes or policies underpinning the regulations. We therefore reject petitioners' contrary contention.[8]

Petitioners also contend that, to the extent that ORS 197.829(1)(a) provides that LUBA "shall affirm" a local government's interpretation of the local government's land use regulation unless it determines that that interpretation is inconsistent with the express language of the regulation, it means only that LUBA should not engage in a process of "initially and independently" interpreting the local code when considering a local government's interpretation of the code.

---

[8] Of course, the city could commit a separate legal error if it were to conclude that two or more code provisions were in conflict when, correctly read, they were not. But that is not the kind of case that is before us now.

The statute does not mean, petitioners assert, that LUBA must refrain from using its full review authority under a related statutory standard, ORS 197.835(9)(a)(D), to examine the local government's interpretation for consistency with the express wording of the local code (including consideration of countervailing arguments and interpretations that may be more rational).

In support of their argument, petitioners observe that, prior to this court's decision in *Clark* and the legislature's subsequent codification of the rule of *Clark* in ORS 197.829(1), Oregon's appellate courts treated the question of whether a local land use decision "improperly construed applicable law," for purposes of *former* ORS 197.835(7)(a)(D) (the predecessor to ORS 197.835(9)(a)(D)), as a question of law to be decided by the courts and other reviewing bodies. Petitioners argue that, when the legislature later enacted the standard of review at issue here, ORS 197.829(1), it did not intend to remove the authority that LUBA previously had enjoyed to determine for itself whether the local government had "improperly construed the applicable law" under *former* ORS 197.835(7)(a)(D), including whether the local interpretation was inconsistent with the express wording of a local ordinance. Petitioners purport to find evidence of that intent in the legislative history of ORS 197.829(1), particularly in statements in committee to the effect that the bill under consideration would codify *Clark* only to the extent that the local provision at issue is aimed at implementing some local purpose or object.

We disagree. Certainly, there is no *textual* support for the idea that, under ORS 197.835(9)(a)(D), LUBA retains some broad review authority that is unaffected by the subsequently enacted and very specific direction to LUBA in ORS 197.829(1) to affirm a local government's interpretation of its own land use regulations that is not inconsistent with the regulation's express wording, purpose, or policy.[9] Neither do

---

[9] In addition, this court's discussion of *Clark* in *Gage* is inconsistent with petitioner's view that *former* ORS 197.835(7)(a)(D) was, and the current version of ORS 197.835(9)(a)(D) continues to be, a source of plenary review authority that can be separated from the deference requirement by *Clark* and ORS 197.829(1):

"The [*Clark*] court pointed out that LUBA's authority to review a local land use decision is derived from statute and that the relevant statute requires LUBA

we find support for petitioners' reliance on legislative history, a further discussion of which is unnecessary.

Petitioners argue, finally, that the Court of Appeals applied an erroneous standard of review to *LUBA's* decision. Petitioners observe that the relevant statutory standard, ORS 197.850(9), does not confer authority on the Court of Appeals to review local government decisions directly but, instead, instructs the court to review *LUBA's* orders to determine if they are "unlawful in substance or procedure."[10] From that premise, petitioners suggest that the court is limited to reviewing for errors in LUBA's application of ORS 197.835(9)(a)(D) and ORS 197.829(1)—particularly, for failure to employ the applicable rules of statutory construction. It follows, petitioners argue, that the Court of Appeals has no authority to conduct a new and separate review of the underlying local government's decision and that the court acted improperly when, based on its *own* determination that the city's interpretation of its own land use regulations was "plausible," it reversed LUBA's order.

■ Petitioners misunderstand the applicable standard of review. A LUBA decision is "unlawful in substance" (in at least one way) if, in contravention of the standard of review set out at ORS 197.829(1), LUBA substitutes its own interpretation of a local government's land use regulations for a plausible interpretation of those regulations offered by the local government. In the face of a claim that LUBA violated that standard, the Court of Appeals must determine whether the local government's interpretation in fact *is* "plausible." The fact that the Court of Appeals makes its own determination about the plausibility of the local government's interpretation does not mean that it has bypassed its duty to

---

to reverse or remand such a decision if LUBA finds that the local government 'improperly construed the applicable law.' ORS 197.835(7)(a)(D). The [*Clark*] court then proceeded to identify the boundaries of LUBA's authority, under that statutory standard of review, to substitute its own interpretation of a local ordinance for that of the local government."

*Gage*, 319 Or at 314.

[10] ORS 197.850(9) provides, in part:

"The court may affirm, reverse or remand the order. The court shall reverse or remand the order only if it finds:

"(a) The order to be unlawful in substance * * *."

review LUBA's order; that determination is a necessary component of the court's analysis of a question subsumed into the court's own "unlawful in substance" standard of review. The specific question for the Court of Appeals (and, on review, for this court) therefore is: Did LUBA violate the statutory requirement that it affirm a local government's interpretation unless it is "inconsistent with the express language" of a relevant regulation?

■    To determine whether LUBA ignored the relevant statutory standard when it reversed the city's decision, this court (like the Court of Appeals) must determine *for itself* whether the interpretation underpinning the local government's decision is "inconsistent with the express language" of the provision or provisions at issue. To the extent that the interpretation is directed at a single term or statement, that means determining whether the interpretation plausibly accounts for the text and context of the term or statement. But, to the extent that the interpretation is directed at multiple statements that may be in conflict, the inconsistency determination is a function of two inquiries: (1) whether the interpretation in fact is an interpretation, *i.e.*, a considered determination of what was intended that plausibly harmonizes the conflicting provisions or identifies which ones are to be given full effect; and (2) the extent to which the interpretation comports with the "express language" of the relevant provisions (including, necessarily, those provisions that, according to the interpretation at issue, are to be given full effect).

■    We turn to the city's interpretation of the code. As discussed, MLDC 10.290(2) directs SPAC to approve a site plan and architectural review application if it can find that the proposed development conforms, or can be made to conform through the imposition of conditions, with "the *applicable* provisions of all city ordinances." (Emphasis added.) The city contends that the provisions on which petitioners rely, MLDC 10.460, MLDC 10.461, and MLDC 10.462, are not "applicable" for purposes of MLDC 10.290(2). Because nothing in the *text* of MLDC 10.290(2) (or in the text of any other provision of the MLDC) expressly states whether the provisions cited by petitioner are "applicable," the arguments with respect to that question necessarily are based on context.

We already have described petitioners' argument in that regard—that the requirements set out in MLDC 10.461 and MLDC 10.462 are, by their clear terms, directed at proposed "development" and, because the Wal-Mart project is a proposed "development," the requirements therefore are "applicable." The city's argument is somewhat more involved. In a nutshell, the city posits that (1) the MLDC's organizational provisions, which set out the roles and responsibilities of SPAC and other commissions and individuals who are authorized to review various land use actions, dictate which provisions of the MLDC are "applicable" to SPAC review, and (2) under those organizational provisions, requirements pertaining to the adequacy of public streets like those set out in MLDC 10.461 and MLDC 10.462 are not within SPAC's purview and thus are not "applicable" within the meaning of MLDC 10.290(2).

The city begins with MLDC 10.100, which describes the purpose of Article II—the section of the MLDC that contains most of the organizational provisions that are the focus of the issue on which the city's argument depends. That provision states:

> "The purpose of [Article II] is to designate and define the responsibilities of the approving authorities and to set forth the procedural requirements and substantive criteria for plan authorizations and the development permit."

The city then points to provisions within Article II that pertain specifically to SPAC. The first provision, MLDC 10.132, assigns exclusive responsibility for approving site plan review applications to SPAC. Another provision, MLDC 10.287, sets out the required contents of a site plan review application. In the city's view, that provision is significant because, with respect to traffic impacts, the required content is limited to information about parking, points of ingress and egress, and adjacent street improvements.[11]

---

[11] MLDC 10.287 provides that a site plan and architectural review application will include various information about the site, including, for example, lot dimensions and the location, size, and height of all proposed and existing buildings. Arguably relevant to traffic impacts are the following requirements:

"(1) Site Plan:

"* * * * *

Finally, the city relies on MLDC 10.285, which describes the scope of site plan review in the following terms:

> "The Site Plan and Architectural Review process is established in order to provide for review of the functional and aesthetic adequacy of development and to assure compliance with the standards and criteria set forth in this chapter for the development of property as applied to the improvement of individual lots or parcels of land as required by this code.
>
> "Site Plan and Architectural Review considers consistency in the aesthetic design, site planning and general placement of related facilities such as street improvements, off-street parking, loading and unloading areas, points of ingress and egress as related to bordering traffic flow patterns, the design, placement and arrangement of buildings as well as any other subjects included in the code which are essential to the best utilization of land in order to preserve the public safety and general welfare, and which will encourage development and use of lands in harmony with the character of the neighborhood within which the development is proposed."

Again, the city observes that, with regard to transportation impacts, SPAC's review authority is limited to considering street improvements adjacent to the site and "points of ingress and egress related to bordering traffic flow." The city concludes, from the foregoing provisions, that SPAC's site plan review authority is limited to the site itself and the public streets bordering it, and does not extend to the broader traffic impacts with which MLDC 10.461 and MLDC 10.462 are concerned.

---

"(e) Existing and proposed off-street parking: location, number, type and dimensions of spaces, parking area, internal circulation pattern.

"(f) Access: pedestrian, vehicular, service, points of ingress and egress.

"(g) Loading: location, dimension, number of spaces, type of space (A or B), internal circulation.

"* * * * *

"(i) Street dedication and improvements

"* * * * *

"(k) Location of existing public improvements including streets, curbs, sidewalks, street trees, utility poles, light fixtures, traffic signs and signals, and such other data as may be required to permit the Site Plan and Architectural Commission to make the required findings."

The city further contends that, in fact, it is clear that the broader traffic impacts that are the subject of MLDC 10.461 and MLDC 10.462 are within the purview of an entirely different reviewing authority—the Planning Commission—and are to be dealt with by that body in the process of zone change review.[12] The city points to MLDC 10.227, which sets out the criteria that must be met in order for the Planning Commission to approve a zone change. That section expressly requires that such zone changes meet the minimum standards provided in MLDC 10.462 and that they be consistent with the city's Transportation System Plan (TSP). MLDC 10.227(2);[13] MLDC 10.227(1) (requiring consistency with TSP).

Under that provision, the Planning Commission must determine whether street capacity is "adequate[ to] serve the subject property with the permitted uses" that a requested zone change would allow before it approves the zone change. MLDC 10.227(2). That, in the city's view, is

---

[12] Zone Changes are one of five actions or "plan authorizations" for which the Planning Commission is designated as the approving authority. MLDC 10.122. A zone change "may be initiated by the Planning Commission either on its own motion or at the request of the City Council, or by application of the property owner(s) in the area subject to the zone change." MLDC 10.225.

[13] MLDC 10.227(2) provides, in relevant part:

"It shall be demonstrated that Category A urban services and facilities are available or can and will be provided, as described below, to adequately serve the subject property with the permitted uses allowed under the proposed zoning, except as provided in subsection (c) below. *The minimum standards for Category A services and facilities are contained in Section 10.462 and Goal 2 of the Comprehensive Plan 'Public Facilities Element' and Transportation System Plan.*

"* * * * *

"(b) Adequate streets and street capacity must be provided in one (1) of the following ways:

"(i) Streets which serve the subject property, *as defined by Section 10.461(2),* presently exist and have adequate capacity; or

"(ii) Existing and new streets that will serve the subject property will be improved and/or constructed, sufficient to meet the required condition and capacity, at the time building permits for vertical construction are issued; or

"(iii) If it is determined that a street must be constructed or improved in order to provide adequate capacity for more than one (1) proposed or anticipated development, the Planning Commission may find the street to be adequate when the improvements needed to make the street adequate are fully funded * * *."

(Emphasis added.)

when MLDC 10.461 and MLDC 10.462 come into play. Thereafter, when particular developments on particular sites are proposed and require site plan and architectural review, SPAC may (and, in fact, must) consider traffic issues *on the site and the streets that border it* ("street improvements, off-street parking, loading and unloading areas, points of ingress and egress as related to bordering traffic flow patterns") as provided in MLDC 10.285. But the city insists that SPAC has no authority, at that point or any other, to revisit the broader adequacy-of-traffic-service analysis and determination that the Planning Commission was required to make at the time of the zone change.

■      In our view, the city's argument is persuasive. The city reads the more generic statements in MLDC 10.285 as being narrowed by the more specific wording with which they are conjoined, and also reads MLDC 10.227 as explicitly requiring a TIA at the time of any zone change. That reading is plausible, and is not inconsistent with the "express language" of the provisions at issue or the purposes or policies underpinning them. Thus, both LUBA and this court are required to accept the city's determination that the MLDC rules on which petitioners rely are not applicable. LUBA erred in concluding otherwise, but the Court of Appeals appropriately reversed that error.[14]

The decision of the Court of Appeals is affirmed. The order of the Land Use Board of Appeals is reversed.

---

[14] Our affirmance does not, however, endorse the Court of Appeals' statement that "neither party's contentions fully harmonize all cited provisions of the city's code." In fact, the city's position *does* harmonize all the cited provisions by demonstrating plausibly that the provision on which petitioners rely are not "applicable" to SPAC's task. That disagreement notwithstanding, the Court of Appeals reached the correct result.