Argued and submitted November 21, 2011, affirmed January 25, petition for review denied June 28, 2012 (352 Or 170)

## TONQUIN HOLDINGS, LLC,
*Petitioner,*

*v.*

## CLACKAMAS COUNTY,
Friends of Rock Creek, Raindrops to Refuge,
and Friends of the Tualatin River National Wildlife Refuge,
*Respondents.*

Land Use Board of Appeals
2011025

## FRIENDS OF ROCK CREEK,
*Respondent,*

*v.*

## CLACKAMAS COUNTY,
*Respondent,*

*and*

## TONQUIN HOLDINGS, LLC,
*Petitioner.*

Land Use Board of Appeals
2011026; A149553

270 P3d 397

Steven L. Pfeiffer argued the cause for petitioner. With him on the brief were Seth J. King, and Perkins Coie LLP.

Erin Madden argued the cause for respondents Friends of Rock Creek, Friends of the Tualatin River National Wildlife Refuge, and Raindrops to Refuge. With her on the brief was Cascadia Law P.C.

Stephen L. Madkour, Clackamas County Counsel, waived appearance for respondent Clackamas County.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Petitioner Tonquin Holdings, LLC, seeks review of an order of the Land Use Board of Appeals (LUBA) in two consolidated LUBA appeals. Petitioner asserts two assignments of error. Petitioner first contends that LUBA erred in upholding one of the conditions imposed by a county hearings officer in his approval of petitioner's proposed aggregate surface mining operation. Petitioner also contends that LUBA erred in overturning the hearings officer's determination that certain county zoning standards were inapplicable to the mining operation. On judicial review, ORS 197.850, we affirm.

As a preliminary matter, we address our standard of review. Under ORS 197.829(1), LUBA is required to affirm a local government's interpretation of its land use regulations, unless LUBA determines that the local government's interpretation:

"(a)   Is inconsistent with the express language of the comprehensive plan or land use regulation;

"(b)   Is inconsistent with the purpose for the comprehensive plan or land use regulation;

"(c)   Is inconsistent with the underlying policy that provides the basis for the comprehensive plan or land use regulation; or

"(d)   Is contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements."

ORS 197.829(1). In the context of a review of a governing body's *own* interpretation of its zoning ordinance, the court applies the highly deferential standard of review described in *Siporen v. City of Medford*, 349 Or 247, 259, 243 P3d 776 (2010) (governing body's interpretation must be upheld if it is "plausible"). In contrast, on review of a local government land use *hearings officer's* interpretation of a local code provision, there is no deference accorded to the interpretation. *Gage v. City of Portland*, 319 Or 308, 312, 877 P2d 1187 (1994). Rather, the hearings officer's interpretation is to be reviewed

for whether it is correct as a matter of law. *Id.* at 317. Respondents Friends of Rock Creek (Friends) and two other organizations that intervened in petitioner's LUBA appeal assert that the rule in *Gage* governs our review.

Petitioner acknowledges that there is a distinction in the standard of review between the review of a governing body's own interpretation of its code and review of a hearings officer's interpretation of the code. Nevertheless, petitioner contends that, in light of *Siporen*, and the increased number of local governments that have delegated final decision-making authority to hearings officers, it is appropriate to reconsider and eliminate that distinction. We note that in *Siporen*, the Supreme Court cited with approval its opinion in *Gage*. 349 Or at 258. If any reexamination of *Gage* is to be undertaken, that is for the Supreme Court. Therefore, we conclude that we review LUBA's order for whether LUBA properly construed the Clackamas County Zoning Code when it determined which conditions were applicable to the proposed conditional use, without deference to the local government hearings officer. *See* ORS 197.850(9) (court shall reverse and remand if the order is "unlawful in substance").

The facts as stated in LUBA's order are not disputed. The property at issue consists of 35.5 acres and is located at the intersection of SW Tonquin Road and SW Morgan Road in unincorporated Clackamas County. The property is zoned Rural Residential Farm and Forest-5 Acre (RRFF-5), and the proposed surface mine is a conditional use within that zone. The land is undeveloped except for an electrical transmission line that crosses the eastern portion from north to south. In the past, the property has supported agricultural and forest uses, but it is currently not used for either. The surrounding area is a mix of uses, including rural residential, business, conservation, and mining. The property is bordered by the Tualatin River National Wildlife Refuge, a gun club, a reclaimed quarry, an active quarry, rural residences, a dog kennel, and open space associated with a floodplain.

The property falls within the Tonquin Geologic Area, a 17-square-mile geologic feature within Washington and Clackamas counties. It includes a basalt deposit, which petitioner proposes to mine and process into aggregate.

The property also contains three wetlands. Wetland A is approximately 1.01 acres and is located entirely within the property toward its eastern end. Wetland B straddles the northern portion of the property line shared with the wildlife refuge; approximately .72 acre of Wetland B is contained within the property. Wetland C straddles the property's western property line, with approximately .42 acre of Wetland C on the property and the remainder on neighboring residential property, subject to a conservation easement for the benefit of Clackamas County.

Under the proposed development, 2.2 acres of wetlands (Wetland A and portions of Wetlands B and C) would be mined or filled. Petitioner proposed to mitigate the impacts of mining the wetlands through a wetlands bank, if required. A county hearings officer issued an order approving petitioner's conditional use application for surface mining on the property, but imposed over 130 conditions.

The conditional use approval criteria are set out at Clackamas County Zoning and Development Ordinance (ZDO) 1203.01. The criterion at issue here, ZDO 1203.01(D), prohibits approval of a conditional use such as surface mining if the conditional use would "alter the character of the surrounding area in a manner that substantially limits, impairs, or precludes the use of surrounding properties for the primary uses allowed in the underlying zoning district." The hearings officer applied ZDO 1203.01(D) to find that, in part, the proposed conditional use "substantially limits, impairs, or precludes" those "primary uses" on land *adjacent* to the proposed conditional use.

In the context of this case, the relevant affected "primary uses" on adjacent lands include "public and private conservation areas," ZDO 309.03(D), and "fish and wildlife management programs," ZDO 309.03(E). The hearings officer determined that the wildlife refuge to the north of the subject property, which is the site of the larger portion of Wetland B, qualifies as a public conservation area and is also subject to a fish and wildlife management program. Additionally, the hearings officer found that a conservation easement held by the county on a portion of Wetland C extending onto private land to the south of the subject property constitutes a private

conservation area. The hearings officer found that allowing petitioner to mine and fill Wetlands B and C as proposed would likely cause the remaining portions of those wetlands on adjacent properties to cease functioning as wetlands.[1]

At the same time, the hearings officer found that, with proper vegetative buffers in place to protect Wetlands B and C, the mining could proceed. To ensure compliance with ZDO 1203.01, the hearings officer imposed Condition 55, which states:

> "[Petitioner] shall not evacuate Wetlands B and C. These wetlands shall be protected through wetland buffers as prescribed by [Clackamas County Water Environment Services (WES)] regulations. [Petitioner] shall submit a revised site plan to the Planning Division and WES showing required vegetative buffers around Wetlands B and C."

Condition 55 precludes excavating Wetlands B and C and their related buffer areas, the effect of which is to limit the surface and subsurface area of the mine and the volume of aggregate material available for excavation.

Petitioner appealed to LUBA, disputing the hearings officer's interpretation of ZDO 1203.01(D) to prohibit approval of a conditional use that "substantially limits, impairs, or precludes" those "primary uses" of *adjacent* RRFF-5 zoned property. Petitioner argued that the hearings officer's interpretation of ZDO 1203.01(D) was incorrect in light of *Gordon v. Clackamas County*, 10 Or LUBA 240 (1984).

In *Gordon*, LUBA had granted a conditional use permit to allow expansion of an airport. The expansion was going to result in the loss of 10 rural residences, and some

---

[1] The hearings officer found:

"I find that there is substantial evidence in the record that if partially filled, Wetlands B and C are likely to be degraded by lack of sufficient water, changed circulation patterns, potential dewatering, introduction of weeds and invasive plant species, and loss of wildlife habitat. In short, the record shows that if [Wetlands B and C are] partially filled, the remaining portions of the wetlands have a likelihood of no longer functioning as wetlands. This represents a substantial impairment or limitation to a primary use under ZDO 1203.01(D)."

individuals needed to move. *Id.* at 271. LUBA said that ZDO 1203.01(D)

> "does not impose an absolute prohibition on a use which alters the character or other uses of the surrounding properties. The provision simply requires that the use will not alter the character of the surrounding area in a way which 'substantially limits' surrounding uses allowed in the underlying zone."

*Id.* LUBA also had stated that "it is only reasonable to consider the [surrounding] area to be larger than that immediately [a]ffected by new construction at the airport." *Id.* LUBA had concluded that the dislocation of persons immediately adjacent to the proposed use did not violate ZDO 1203.01(D). *Id.*

In petitioner's view, *Gordon* mandated that "the appropriate scope of the impact area under [ZDO] 1203.01(D) extends well beyond" the adjacent and immediately affected properties. Petitioner argued that a proper construction of ZDO 1203.01(D) in light of *Gordon* is that the dislocation or displacement of a single use within a larger geographic impact area is not an indication that the conditional use "'substantially limits, impairs, or precludes' the use of the area as a whole." In other words, in petitioner's view, the fact that petitioner's mining could eliminate the immediately adjacent off-site wetlands, as the hearings officer found, is not an impact that implicates ZDO 1203.01(D).

LUBA sustained the hearings officer's ruling, explaining that petitioner was reading *Gordon* too broadly. In *Gordon*, the persons who were going to be displaced by the expansion of the airport were residents of properties that were to be condemned to expand the airport. In that context, LUBA said that *Gordon*, properly understood, explains that the "surrounding area" for purposes of ZDO 1203.01(D) is not limited to the adjoining properties that are to be acquired for the airport expansion, but rather properly can be viewed to include some of the properties that will remain occupied by nonairport uses after that airport expansion and that may be impacted by the airport expansion. LUBA explained that its opinion in *Gordon* should not be understood to have announced a hard and fast rule and does not preclude the

possibility that, in a particular case, "impacts to adjoining uses *only* may be sufficient to constitute a violation of ZDO 1203.01(D)."

In its petition for judicial review, petitioner continues to assert that the hearings officer's, and now LUBA's, interpretation of ZDO 1203.01(D) is erroneous. Therefore, petitioner contends, LUBA erroneously affirmed Condition 55, which precluded petitioner's excavation of Wetlands B and C and related buffer areas based on adverse effects on adjacent properties. In petitioner's view, LUBA's decision in petitioner's appeal has changed the way LUBA applies ZDO 1203.01(D), and LUBA should revert to the precedent set in *Gordon* requiring consideration of a geographic area beyond adjacent properties when determining whether the proposed conditional use substantially impairs allowable uses of surrounding properties.

We, like LUBA, disagree with petitioner's view of *Gordon.* LUBA necessarily concluded in *Gordon* that, in the context of that particular proposed use—the expansion of an airport onto 10 adjacent residential properties—and in light of the fact that surrounding properties were available to accommodate residential use, the dislocation of persons who lived next to the airport did not substantially limit, impair, or preclude residential uses in the surrounding area next to the residential properties to be acquired as part of the airport expansion. 10 Or LUBA at 271. Here, in contrast, the primary conservation use that will be impacted or, possibly, eliminated by the proposed mining operation is a finite and unique resource that is rare and exists naturally in a very limited geographic area. Moreover, we agree with the hearings officer and LUBA that ZDO 1203.01(D) applies to impairment of primary uses on adjacent land. We conclude that LUBA did not err in affirming the hearings officer's imposition of Condition 55.

In its own LUBA appeal, Friends challenged other aspects of the hearings officer's interpretation of the county's zoning and development ordinance. As relevant to this judicial review, Friends contended before LUBA that the hearings officer erred in concluding that Section 1000 of the county's zoning code, which provides general development

standards (including standards for the protection of natural features, plants, and wildlife), does not apply to petitioner's proposed aggregate surface mining operation. The hearings officer reasoned that ZDO 1001.02, which defines the scope of the applicability of ZDO Section 1000, does not include mining.

As relevant, ZDO 1001.02(A) provides:

"A.   Section 1000 *shall* apply to partitions; subdivisions; commercial and industrial projects[.]

"B.   The application of these standards to particular development *shall be modified* as follows:

"1.   Development standards which are unique to a particular use, or special use, shall be set forth within the district or in [ZDO] Section 800."

(Emphasis added.) The hearings officer reasoned that the word "shall" as used in ZDO 1001.02(A) indicates an intention to define a finite and exclusive list of projects—"partitions; subdivisions; commercial and industrial projects"—but that surface mining is not one of the listed projects.[2]

In addition, surface mining is a special use that is subject to special use standards set out in ZDO Section 800. Pursuant to ZDO 1001.02(B), the development standards in ZDO Section 1000 are "modified" by special use standards in ZDO Section 800. The hearings officer further reasoned that, because ZDO Section 818 provides special use standards applicable to surface mining, those special use standards supersede the general development standards set forth in ZDO Section 1000 and apply *instead of* the general standards.[3]

---

[2] The hearings officer also concluded that ZDO Section 1000 is limited to construction-related uses and reasoned that, because mining is not construction, ZDO Section 1000 does not apply to it. LUBA rejected that rationale, and the parties do not raise it on judicial review.

[3] The dimensional and development standards that apply to development on RRFF-5 lands are set forth in ZDO 309, which expressly provides, at ZDO 309.09(A), that development "shall be subject to the applicable provisions of [ZDO Section] 1000."

Friends challenged the hearings officer's reasoning, contending first that surface mining qualifies as a "commercial" or "industrial" project and that, therefore, the general development standards are applicable. Further, Friends asserted, the special standards applicable to surface mining only serve to modify but not to replace those general standards.

Petitioner intervened in Friends' LUBA appeal and responded that the hearings officer correctly determined that surface mining is neither commercial nor industrial, because it is not expressly listed in the county code's definitions as either a "commercial" or an "industrial" use.[4] As further support for its position, petitioner also noted that the county's definition of "surface mining" in ZDO 202,[5] unlike some other special use definitions, does not identify mining as either a commercial or industrial use.

LUBA agreed with Friends, rejecting petitioner's contention that the failure to explicitly list surface mining as a commercial or industrial use means that it does not qualify as such a use. In so concluding, LUBA explained that the term "commercial or industrial project" in ZDO 1001.02(A) and the defined terms "commercial use" and "industrial use" are "plainly general categories of uses that include more than one individual member." LUBA then focused on the term "industrial use":

---

[4] ZDO 202 defines "commercial use" as

"[t]he use of land and/or structures for the conduct of retail, service, office, artisan, restaurant, lodging, daycare, entertainment, private recreational, professional, and similar uses."

ZDO 202 defines "industrial use" as

"[t]he use of land and/or structures for manufacturing or processing of primary, secondary, or recycled materials into a product; warehousing and associated trucking operations; wholesale trade; and related development."

[5] ZDO 202 defines "surface mining" as follows:

"Includes the mining of minerals by removing overburden and extracting a natural mineral deposit thereby exposed, or simply such extraction. Surface mining includes open-pit mining, auger mining, production of surface mining waste, prospecting and exploring that extracts minerals or affects land, processing to include rock crushing and batch plant operations, and excavation of adjacent offsite borrow pits other than those excavated for building access roads."

"As defined by the county's code, 'industrial use' includes the use of land for 'processing primary, secondary, or recycled materials into a product.' * * * This definition clearly is sufficiently broad to apply to the on-site rock crushing proposed by [petitioner]."

Thus, LUBA concluded that petitioner's proposed mining development is an "industrial use" as that term is defined in ZDO 202 and an "industrial project" as used in ZDO 1001.02(A). In doing so, LUBA further rejected petitioner's contention that "surface mining" is not an industrial use because the definition of surface mining in ZDO 202 does not expressly state that it is an industrial use. LUBA noted that the county defined some, but not all, uses in ZDO 202 as commercial or industrial and explained that the county need not expressly describe surface mining as an "industrial use" for surface mining to fall within the definition of that use.

LUBA then addressed the hearings officer's conclusion that ZDO Section 1001 contemplates separate sets of approval standards for special uses such as surface mines, to the exclusion of the general standards set forth in ZDO Section 1000. LUBA explained that, although ZDO 1001.02(B) provides that Section 1000's general development standards may be "modified" by special use requirements set out in ZDO Section 800, special use requirements do not entirely displace the general development standards. Citing the dictionary definition of "modify," *Webster's Third New Int'l Dictionary* 1452 (1981), LUBA explained that the commonly understood meaning of "modify" is to "limit" or "change," but not to entirely displace. LUBA found contextual support for that meaning in ZDO 801.01, which describes how the special regulations set forth in ZDO Section 800 relate to the other ZDO standards:

"Special uses are those included in Section 800. Due to their public convenience and necessity and their effect upon the surrounding area, these uses are subject to conditions and standards that differ from those required of other uses. Special uses shall be subject to the provisions of the section that regulates the specific use *and the provisions of the zoning district in which the special use will be located.* Special uses are permitted only when specified as a primary, accessory, limited or conditional use in the subject zoning district.

> *Where a dimensional or development standard for a special use differs from that of the subject zoning district, the standard for the special use shall apply."*

(Emphases added.) LUBA reasoned that the first italicized text of ZDO 801.01 shows that special use provisions do not entirely displace general development standards set forth in Section 1000, but supplement them. In fact, the first italicized text shows that special uses are subject to the special standards *and* the general development standards of the zoning district in which the special use will be located. LUBA reasoned that the second italicized text reinforces that interpretation, providing that the special use standards apply when the development standards for the general zoning district differ from the special standards. Thus, LUBA concluded that the hearings officer was incorrect in determining that the special provisions of ZDO Section 818 entirely displace ZDO Section 1000 standards and remanded the matter to the hearings officer to apply any applicable ZDO Section 1000 standards.[6]

On judicial review, petitioner contends that LUBA erred in overturning the hearings officer's interpretation that petitioner's proposed mining operation is not subject to the general development standards of ZDO Section 1000. And assuming the general development standards in Section 1000 may apply, petitioner further contends that LUBA erred in concluding that they are not completely superseded by the special standards applicable to surface mining in ZDO Section 818.

For several reasons, we agree with LUBA's conclusion that the hearings officer's interpretation was incorrect and that petitioner's proposed mining operation must be evaluated under the general development standards. First, we agree with LUBA that the fact that surface mining is not expressly mentioned within the code provision's definition of "industrial use" does not mean that it does not fall within the code's definition for such use. As noted, "industrial use" is defined as

---

[6] LUBA also concluded that if it were required to reach Friends' additional contention that the hearings officer's interpretation was inconsistent with the county's comprehensive plan, it would so conclude.

"[t]he use of land and/or structures for the manufacturing or processing of primary, secondary, or recycled materials into a product; warehousing and associated trucking operations; wholesale trade; and related development."

LUBA concluded that petitioner's proposed use, which included extraction of materials to be processed through a crusher to make aggregate products, was an industrial use within that definition, and we agree. Notwithstanding the fact that the code's definition of surface mining does not also state that surface mining is an industrial use, petitioner's proposed use is an industrial use because it fits within the code's definition for industrial use as "processing primary, secondary, or recycled materials into a product."

Second, we agree with LUBA that the requirement of ZDO 1001.02(A) that the application of the general development standards *shall be modified* by special standards does not mean that the general standards are necessarily completely displaced. As LUBA correctly explained, ZDO Section 801.01 describes the interplay between the special use standards and the general development provisions, and expressly states that special uses are subject to provisions relating to them *and* to the general development standards of the zoning district in which they will be located. Thus, both the general development standards and the special use standards are applicable, except where the special standards conflict with the general standards, in which case, the special standards control. We therefore conclude that LUBA did not err in remanding this case to the hearings officer to determine whether the general development standards of ZDO Section 1000 are in conflict with the provisions of ZDO Section 818 relating specifically to surface mining.

Affirmed.