Argued and submitted April 5, affirmed August 23, 2017

McKenzie BOWERMAN
and Bowerman Family LLC,
*Respondents,*

*v.*

LANE COUNTY,
*Respondent,*
*and*

Verne EGGE,
*Petitioner.*

Land Use Board of Appeals
2016008; A164236

403 P3d 512

Dan Terrell argued the cause for petitioner. On the brief were Bill Kloos and Law Office of Bill Kloos, PC.

Sean T. Malone argued the cause and filed the brief for respondents McKenzie Bowerman and Bowerman Family LLC.

No appearance for respondent Lane County.

Before Egan, Presiding Judge, and Lagesen, Judge, and Linder, Senior Judge.

## LAGESEN, J.

Petitioner seeks review of a final order of the Land Use Board of Appeals (LUBA). The order remands to Lane County (the county) its decision ministerially approving petitioner's application for a sequence of nine property line adjustments. LUBA remanded on two bases. First, LUBA concluded that the county erred by employing the ministerial process authorized by Lane Code (LC) 13.450(4) to approve the application. Instead, LUBA concluded, the county was required to use the planning director review process otherwise required by LC 13.450(5). Second, LUBA concluded that the county erred to the extent that it approved adjustments to property lines that would not exist but for the county's approval of the property line adjustments requested in the early part of the sequence, and that, as of the time of approval, were not reflected in recorded deeds. On review, petitioner challenges both bases for the remand and also contends that LUBA lacked jurisdiction. We reject petitioner's jurisdictional argument and affirm LUBA's determination that the county erred by ministerially approving petitioner's application, albeit for a different reason than LUBA. We do not reach the issue of whether the county may approve adjustments to property lines that, as of the time of approval, are not reflected on a recorded deed because it is not clear whether that issue will recur.

## I.  BACKGROUND

A. *State and County Law Governing Reconfiguration of Land Through Property Line Adjustments*

ORS chapter 92 governs when and how a unit of land can be configured (or reconfigured) into smaller units of land: "No land may be subdivided or partitioned except in accordance with ORS 92.010 to 92.192." ORS 92.012. Subdividing means dividing a unit of land to create four or more units of land within a calendar year, and results in a "subdivision." ORS 92.010(16) and (17). Partitioning means dividing a unit of land to create three or fewer units of land within a calendar year, and results in a "partition." ORS 92.010(7) and (9). The relevant statutes impose various prerequisites to the approval of subdivisions and partitions,

including the requirement of submitting a tentative plan illustrating the general design of the proposed subdivision or partition. ORS 92.040; ORS 92.044.

The statutes afford an alternative to the subdivision and partition process for reconfiguring land: property line adjustments. ORS 92.010(9) explains that "Partitioning land" within the meaning of the statute does not include the process of adjusting a property line in the manner defined by the statute:

> "'Partitioning land' means dividing land to create not more than three parcels of land within a calendar year, but does not include:
>
> "* * * * *
>
> "(b) Adjusting a property line as property line adjustment is defined in this section[.]"

ORS 92.010(11), in turn, defines "Property line" as "the division line between two units of land" and ORS 92.010(12) defines "Property line adjustment" as

> "a relocation or elimination of all or a portion of the common property line between abutting properties that does not create an additional lot or parcel."

The property line adjustment process thus provides a mechanism by which one or more owners of adjacent units of land may adjust the boundaries between those units of land, provided that the adjustment or adjustments do not create an additional unit of land.[1]

ORS chapter 92 does not, itself, spell out the procedures governing a local government's approval of a property line adjustment. Instead, the legislature has largely left the responsibility to determine the appropriate procedures to local governments, subject to the requirement that any such procedures require the recording of a deed reflecting any approved property line adjustment:

---

[1] Additional requirements apply if a property line adjustment affects a "[l]awfully established unit of land," as that term is defined in ORS 92.010(3)(a). ORS 92.192 (specifying requirements applicable to property line adjustments between "lawfully established units of land").

"(3)   The governing body of a city or a county may use procedures other than replatting procedures in ORS 92.180 and 92.185 to adjust property lines as described in ORS 92.010(12), as long as those procedures include the recording, with the county clerk, of conveyances conforming to the approved property line adjustment as surveyed in accordance with ORS 92.060(7).

"(4)   A property line adjustment deed shall include the names of the parties, the description of the adjusted line, references to the original recorded documents and signatures of all parties with proper acknowledgment."

ORS 92.190.

In accordance with that grant of authority, the county has enacted LC 13.450 to govern the approval of property line adjustments. The provision sets forth two distinct approval processes: a ministerial process and the planning director review process. Under LC 13.450(4), the ministerial process is available for three types of property line adjustments:

"An applicant must obtain ministerial approval or may use the Planning Director review with public notice procedures if the property line adjustment is for:

"(a)   The adjustment of a common property line involving only F-1 zoned properties which are less than 200 acres and the applicant submits a title report for each F-1 property that demonstrates the properties are not encumbered by a nonrevocable deed restriction required for certain forest dwellings pursuant to ORS 215.740 and OAR 660 Division 06; or

"(b)   The adjustment of a common property line between properties in any zone if each adjusted property is vacant and complies with the minimum area requirements of the zoning before and after the property line adjustment; or

"(c)   The adjustment of a common property line between properties where a surveyor certifies that any property reduced in size by the adjustment is not reduced below the minimum lot or parcel size for the applicable zone, and where the setbacks from existing structures and improvements do not become nonconforming or more nonconforming with the setback requirements."

Proposals for property line adjustments that do not fall within the three categories of adjustments eligible for a ministerial approval under LC 13.450(4) are "subject to Planning Director review with public notice, pursuant to LC 14.050 and 14.100." LC 13.450(5). Planning director review requires, among other things, that the director "prepare a written investigation report" after reviewing the application, issue a written decision "based on factual information" that includes "express written findings on each of the applicable and substantive criteria," and provide notice of the decision to, among others, the applicant and the owners of neighboring property. LC 14.100(2) - (4).

B. *Substantive and Procedural Facts*

Petitioner owns a large piece of property in Lane County. That property consists of eight contiguous individual properties, which petitioner sought to reconfigure. Petitioner proposed to accomplish this reconfiguration through a series of nine property line adjustments in a particular sequence. The sequencing was important to petitioner's proposal because, for petitioner to get from the starting configuration to the desired final configuration, the reconfiguration would require the adjustment not only of property lines depicted in the starting configuration, but also the adjustment of property lines that resulted from property line adjustments earlier in petitioner's proposed sequence of adjustments. In other words, petitioner's proposal requested—in part—that the county approve adjustments to property lines that did not yet exist, and would not exist unless and until (1) the county approved the property line adjustments requested in the earlier part of the sequence; and (2) petitioner executed and recorded the property line adjustment deeds reflecting those approved property line adjustments.

In February 2015, petitioner submitted a single application to the county seeking approval of the nine property line adjustments required to reconfigure his property in the manner desired. Petitioner sought to have the proposed sequence of property line adjustments ministerially approved under LC 13.450(4) by using the form supplied by the county for property line adjustments subject to the ministerial approval process. That form contained a checkbox for

landowners seeking approval of a property line adjustment under LC 13.450(4)(c) based on "Surveyor Certification." The form stated further that, for ministerial approval based on a surveyor's certification, the applicant was required to submit certification from a surveyor that included the following two "verbatim" statements:

> "An Oregon licensed surveyor has certified that 'any property reduced in size by the adjustment is not reduced below the minimum lot or parcel size for the applicable zone.'
>
> "An Oregon licensed surveyor has certified that 'the setbacks from existing structures and improvements do not become nonconforming or more nonconforming with the setback requirements of the zoning.'"

Petitioner checked the box indicating that he was seeking approval under LC 13.450(4)(c) and supported his application with a certification from an Oregon licensed surveyor that recited verbatim to the two statements required by the application. Petitioner also provided drafts of the series of property line adjustment deeds that he would file, in sequence, if the county approved the requested sequence of property line adjustments.

In April 2015, the county's planning director approved petitioner's application. In June 2015, petitioner recorded property line adjustment deeds for conveyances conforming to each approved property line adjustment.[2] There is no factual dispute that the deeds were recorded in the proper sequential order. That is, at the time that each deed was recorded, the property line adjusted by that deed had been approved by the county (if it had not existed before petitioner's application) and was reflected in a previously recorded property line adjustment deed.

Respondents Bowerman and Bowerman Family, LLC, appealed the county's decision to LUBA. Before LUBA,

---

[2] In August 2015, the planning director approved forest template dwellings for three of the eight reconfigured properties. Those approvals were not appealed. "What is known as the forest template dwelling statute is part of a group of statutes, ORS 215.700 to 215.783, that addresses the extent to which owners of forestland may construct dwellings on that land." *Friends of Yamhill County v. Yamhill County*, 229 Or App 188, 192, 211 P3d 297 (2009).

they contended, among other things, that (1) petitioner's application was not eligible for ministerial approval and that the county therefore erred by approving petitioner's application through the ministerial approval process rather than through the planning director review process; and (2) the county erred by permitting petitioner to obtain approval of nine property line adjustments at the same time, at least where some of the approved property line adjustments adjusted previously adjusted property lines. Specifically, respondents argued that the county lacked authority to approve a property line adjustment to a property line that, at the time of approval, was not yet reflected on a recorded property line adjustment deed.

In response, petitioner argued that LUBA lacked jurisdiction under ORS 197.015(10)(b)(A)[3] to review the county's decision because it was a ministerial decision that did not involve the exercise of legal interpretation or policy judgment and that the county otherwise correctly approved his application. LUBA rejected petitioner's jurisdictional challenge and agreed with respondents' contentions that the county erred by approving petitioner's application through the ministerial approval process. In concluding that it had jurisdiction, LUBA interpreted LC 13.450(4)(c) differently from the planning director and the parties. The planning director interpreted the provision to authorize approval of a requested property line adjustment where a licensed surveyor made the two verbatim certifications required by the application. LUBA, however, interpreted the provision to require the planning director to make an independent determination whether the proposed property line adjustment would result in nonconforming or more nonconforming setbacks—a determination that required legal interpretation and the exercise of policy judgment. Thus, LUBA reasoned, the planning director's decision was not ministerial at all, but instead was the type of decision subject to LUBA's review.

Having determined that it had jurisdiction and having interpreted LC 13.450(4)(c) to require the planning

---

[3] ORS 197.015(10)(b)(A) provides that a "land use decision" does not include "a decision of a local government" that "is made under land use standards that do not require interpretation or the exercise of policy or legal judgment."

director to make a nonministerial decision in approving an application submitted under that provision, LUBA next concluded that the county erred by approving the application ministerially, rather than through planning director review under LC 13.450(5). Thus, LUBA concluded, a remand was required because the county had failed to use the planning director review process. LUBA also concluded that a remand was required for a different reason: ORS chapter 92 implicitly precludes a local government from approving more than one property line adjustment in a single decision where, as of the time of decision, some of the adjustments are to property lines that are not yet reflected in recorded deeds. Board Member Ryan dissented on that point, reasoning that the text of ORS chapter 92 did not impose the limitation imposed by the LUBA majority, and that a local government could adequately address the concerns expressed by the majority through conditions of approval, making the approval contingent on the applicant recording the necessary property line adjustment deed or deeds.

On review, petitioner contends that LUBA erred in all respects. He asserts that his application was rightfully approved (1) as the planning director's ministerial decision without notice or a right to appeal under LC 13.450(4)(c), which, in petitioner's view, also means that it is not a "land use decision" as defined by ORS 197.015(10)(b)(A) and, thus, not within LUBA's jurisdiction and (2) in a single application because ORS chapter 92 does not prohibit the county from approving further adjustments of an adjusted property line in the context of a single application.[4]

## II. ANALYSIS

We review LUBA's order to determine whether it is unlawful in substance. ORS 197.850(9)(a). Here, LUBA's jurisdictional determination and its determination that the county erred by ministerially approving petitioner's application turned on its interpretation of the Lane County Code.

---

[4] Whether an application for property line adjustments is approved ministerially can substantially affect the time it takes for approval because of the notice or hearing requirements and the cost, which is several times more expensive for property line adjustment applications subject to planning director review. Also, of course, requiring multiple applications for property line adjustments would correspondingly multiply the time it takes for approval.

We review LUBA's interpretation for legal correctness, and do not defer to LUBA's interpretation. *Sellwood-Moreland Improv. League v. City of Portland*, 262 Or App 9, 16-17, 324 P3d 549 (2014).[5] Instead, we apply the ordinary principles of statutory construction "and determine the [county's] intent in enacting the pertinent code provisions by examining the text, context and any helpful enactment history." *Sellwood-Moreland Improv. League*, 262 Or App at 16-17; *Tonquin Holdings, LLC v. Clackamas County*, 247 Or App 719, 722-23, 270 P3d 397, *rev den*, 352 Or 170 (2012). Finally, on the question of whether LUBA correctly interpreted the provisions of ORS chapter 92, we review LUBA's interpretation of a statute in the same way, employing ordinary principles of statutory construction. *Trautman/Conte v. City of Eugene*, 280 Or App 752, 758, 383 P3d 420 (2016). In conducting our review, we have an independent obligation to construe the relevant code and statutory provisions correctly, regardless of the parties' particular arguments about how those provisions should be interpreted. *Gunderson, LLC v. City of Portland*, 352 Or 648, 662, 290 P3d 803 (2012) (citing *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997)).

We start with petitioner's challenge to LUBA's jurisdiction. Pointing to the fact that the planning director approved petitioner's application ministerially, petitioner argued before LUBA, and repeats before us, that LUBA lacked jurisdiction to review the county's decision because LUBA does not have jurisdiction to review decisions that are "made under land use standards that do not require interpretation or the exercise of policy or legal judgment." ORS 197.015(10)(b)(A). LUBA rejected that argument. It

---

[5] We note that in this case we (and LUBA) have not been presented with an interpretation of the code by the county that would be entitled to deference under *Siporen v. City of Medford*, 349 Or 247, 259, 243 P3d 776 (2010). The county did not appear before LUBA or before us to offer an interpretation of the code, and the planning director's interpretation of the code, which is evidenced by the planning director's decision, is not one to which *Siporen* deference applies. *Sellwood-Moreland Improv. League*, 262 Or App at 17 (explaining that, under *Gage v. City of Portland*, 319 Or 308, 317, 877 P2d 1187 (1994), and *Gage v. City of Portland*, 133 Or App 346, 349-50, 891 P2d 1331 (1995), "we give no deference to the interpretations of a local government's land use regulations made by LUBA or by any decision-maker other than the governing body of that local government"). That means LUBA had to independently determine the meaning of the relevant code provision, as do we.

did so by interpreting LC 13.450(4)(c) to require the planning director to determine whether a proposed property line adjustment results in nonconforming or more nonconforming setbacks, a determination that LUBA further concluded "requires interpretation or the exercise of policy or legal judgment." Therefore, LUBA reasoned, the county's decision was not one that was "made under land use standards that do not require interpretation or the exercise of policy judgment," and was not excepted from its jurisdiction by ORS 197.015(10)(b)(A).

For reasons we explain below in addressing petitioner's next argument, LUBA erred when it interpreted LC 13.450(4)(c) to require the planning director to determine whether a proposed property line adjustment would result in nonconforming or more nonconforming setbacks. Contrary to LUBA's interpretation, the provision, properly construed, authorizes the planning director to ministerially approve a property line adjustment based on a surveyor's certifications that affected land will not be reduced below the applicable minimum size for the lot or parcel, and that the adjustment will not result in nonconforming or more nonconforming setbacks. In other words, LC 13.450, when it is correctly interpreted, provides for an approval process that is truly ministerial, and that does not require legal interpretation or the exercise of policy judgment.

That does not mean, however, that LUBA erred in determining that it had jurisdiction. Respondents argued below that the county employed the wrong procedure in approving petitioner's application and, as a result, applied the wrong legal standards when it approved petitioner's application using the ministerial process. Respondents further argued that, as a procedural matter, the county was not permitted to approve a property line adjustment to a property line that resulted from a property line adjustment approved in the context of the same application. According to respondents, petitioner's application for multiple property line adjustments was not subject to approval under the ministerial process and, instead, had to be approved through the planning director review process: "[a]ll other property line adjustment applications are subject to Planning

Director review with public notice, pursuant to LC 14.050 and 14.100." LC 13.450(5).

Under those circumstances, LUBA had jurisdiction to review the county's decision, at least insofar as that decision embodied determinations that the ministerial approval process, rather than the planning director review process, applied, and that petitioner was permitted to propose multiple property line adjustments in a single application, including property line adjustments to property lines that result from property line adjustments approved in connection with the same application. As we long have recognized, "failures by local governments to follow substantive or procedural requirements for a land use decision * * * 'are reviewable * * * by the land use appeal process.'" *Crist v. City of Beaverton,* 143 Or App 79, 84, 922 P2d 1253 (1996), *rev den,* 326 Or 57 (1997) (quoting *Sauvie Island Agricultural v. GGS (Hawaii), Inc.,* 107 Or App 1, 7, 810 P2d 856 (1991)). In all events, LUBA's determinations—whether petitioner's application for nine property line adjustments was subject to approval through the ministerial process and whether all of petitioner's requested property line adjustments could be approved in the context of a single application—are determinations that require the exercise of legal interpretation. LUBA thus had jurisdiction to review those procedural decisions.

The next question is whether LUBA erred when it concluded that LC 13.450 required the county to use the planning director review process to evaluate petitioner's application. We conclude that LUBA did not err, but our reasons are different from those LUBA provided.

As noted, in determining that the county was required to use planning director review, LUBA interpreted LC 13.450(4)(c) to require the planning director to use interpretation or to exercise policy or legal judgment to approve an application under that provision. To recall, that provision allows for "ministerial approval" of the

"adjustment of a common property line between properties where a surveyor certifies that any property reduced in size by the adjustment is not reduced below the minimum lot or parcel size for the applicable zone, and where the setbacks

from existing structures and improvements do not become nonconforming or more nonconforming with the setback requirements."

LC 13.450(4)(c). LUBA interpreted that provision to allow approval of a property line adjustment where (1) a surveyor certifies that the affected properties are not reduced below the minimum lot or parcel size for the applicable zone and (2) the *planning director* makes an independent determination that any setbacks do not become nonconforming or more nonconforming. Although that interpretation certainly is a reasonable interpretation of the text of the provision (and perhaps the most natural reading of it, given its syntax), it is not the only reasonable interpretation. The provision also reasonably can be read as the planning director reads it: to allow approval of a property line adjustment where the applicant submits a "verbatim" certification from a licensed Oregon surveyor attesting that *both* criteria for approval are met.[6] In other words, the provision is ambiguous on the point of whether the planning director must independently determine whether any setbacks become nonconforming or more nonconforming, or whether the planning director may approve an application that is supported by a surveyor's certification on the point.

Context, however, resolves that ambiguity in favor of the planning director's interpretation. The evident intent behind LC 13.450(4) was to create a streamlined, ministerial approval process for three narrow categories of applications for property line adjustments. The provision explicitly designates the process as "ministerial approval." Construed as the planning director construes it, LC 13.450(4)(c) provides for a ministerial process: A property line adjustment will be approved if the application is supported by a surveyor's recitation of two verbatim statements. Such a process would be purely ministerial and would not entail interpretation or the exercise of policy or legal judgment. By contrast, LUBA's interpretation would mean that the process created was

---

[6] Although neither the county nor the planning director has appeared in this proceeding, the planning director's interpretation of LC 13.450(4)(c) is evidenced both by the planning director's check-the-box form for a property line adjustment eligible for ministerial approval and by the planning director's decision to approve petitioner's requested property line adjustments based on the surveyor's certifications as to both approval criteria.

not a ministerial process, contrary to the county's express intention to create one.

Additional context likewise supports the planning director's interpretation. Although LC 13.450 directs the planning director to "review one or more property line adjustments when the following standards are met," thus allowing for the review of an application that proposes more than one property line adjustment, the text of LC 13.450(4) indicates that the ministerial approval process applies only to applications for single property line adjustments: "An applicant must obtain ministerial approval or may use the Planning Director review with public notice procedures if *the property line adjustment* is for" an adjustment within the three categories of adjustments for which the ministerial approval process is available.[7] (Emphasis added.) The use of the definite article "the" before the singular "property line adjustment" signals an intent that the provision apply to one single property line adjustment. *See State v. Branam*, 220 Or App 255, 260, 185 P3d 557, *rev den*, 345 Or 301 (2008) ("The fact that the legislature used the definite article 'the' and the singular form of the noun 'sentence' suggests that it intended the requirements in ORS 137.225(1)(a) to apply to only one particular sentence."); *Carrillo v. City of Stanfield*, 241 Or App 151, 157, 255 P3d 491 (2011) ("a singular noun prefaced by the definite article 'the'" indicates an intent that a statute apply to one particular thing). The ensuing descriptions of the types of property line adjustments for which ministerial

---

[7] We note that this is how the planning director interprets LC 13.450(4). Although the planning director processed petitioner's application for ministerial approval of more than one property line adjustment, not long thereafter the planning director issued interpretive guidance on the provision, explaining that "[t]he singular nature of the language for ministerial [property line adjustments] indicates that only one common property boundary between two units of land can be adjusted per ministerial application." Lane County Planning Director Memorandum to Interested Parties, Dec 14, 2015 (available at http://www.lanecounty.org/UserFiles/Servers/Server_3585797/File/Government/County%20Departments/Public%20Works/Land%20Management%20Division/Land%20Use%20Planning%20Zoning/PLA_Notice_2016.pdf) (accessed Aug 16, 2017).

Although LUBA rejected respondents' argument that LC 13.450(4) authorizes ministerial approval for single property line adjustments and respondents have no cross-assigned error to that conclusion, as we observed earlier, we have an independent obligation to correctly construe that code provision, regardless of the parties' particular arguments about how it should be interpreted.

approval is available refer to "*the* adjustment of *a*" property line, further indicating that ministerial approval is available only to single property line adjustments. (Emphasis added.) That the provision as a whole contemplates ministerial approval for only single property line adjustments is consistent with the planning director's interpretation of LC 13.450(4)(c) to provide for approval based on the surveyor's certification that the two criteria are met. It underscores that the county's likely intention in enacting LC 13.450(4)(c) was to create a simple, nondiscretionary process for approving certain single property line adjustments based on a surveyor's certification, thereby eliminating for a relatively narrow and uncomplicated class of property line adjustments the need for the planning director to conduct an investigation and undertake the other processes entailed in planning director review.

We therefore conclude that LC 13.450(4)(c), correctly construed, authorizes the planning director to ministerially approve a *single* property line adjustment based on a surveyor's certification that the affected units of land will not be reduced below the minimum size required by applicable zoning requirements and that the adjustment will not result in nonconforming or more nonconforming setbacks. Our conclusion means that, although LUBA erred in construing the provision to require the planning director to independently assess the setback issue, LUBA's disposition ultimately was correct. Because LC 13.450(4) provides for ministerial approval of single property line adjustments only, LUBA correctly concluded that the planning director erred by reviewing petitioner's application through the ministerial approval process, rather than through the planning director review process. LUBA thus correctly remanded to the county on that basis.

That leaves the question of whether LUBA erred when it concluded that ORS chapter 92 prohibited the planning director from approving the requested property line adjustments because some of the requested adjustments were to property lines that, as of the time of the planning director's decision, were not yet reflected in recorded property line adjustment deeds. We conclude that it is premature to address that question because it may not arise again in this

case. On remand to the county, petitioner may elect to seek ministerial approval of the proposed property line adjustments one at a time, in which event the issue will not arise at all. Alternatively, if petitioner seeks approval through the planning director review process, it may be possible that the planning director will be able to structure any approval in a way that satisfies whatever implicit limits ORS chapter 92 places on a local government's authority to approve an adjustment to a property line (if such limits exist, an issue we do not decide here), when that property line is not yet reflected in a recorded deed. Conceivably, the planning director also may deny one or more of the requested adjustments based on the more extensive record likely to be developed through the planning director review process. In any event, the statutory construction question is an important one to local governments and landowners, the answer is not readily apparent from the face of the statutes, the question has divided LUBA, and it is uncertain whether resolution of the question will have a practical effect on the parties to this case. Given our conclusion that LUBA correctly determined that petitioner's application is subject to the planning director review process, those circumstances all weigh against addressing the question at this time. We therefore express no opinion on the correctness of LUBA's interpretation of the requirements of ORS chapter 92.

For the foregoing reasons, LUBA's decision that the planning director erred by approving petitioner's application for nine property line adjustments through Lane County's ministerial approval process is affirmed.

Affirmed.