Submitted March 29, reversed and remanded October 12, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHERI LINN HUTCHINS,
*Defendant-Appellant.*

Yamhill County Circuit Court
13CR09518, CR110582;
A158060 (Control), A158061

383 P3d 399

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Erica Herb, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Dustin Buehler, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Tookey, Judge, and DeHoog, Judge.

## SERCOMBE, P. J.

Defendant appeals a judgment of conviction for hindering prosecution, ORS 162.325(1)(a),[1] and a judgment finding her in violation of probation based on that conviction. Defendant raises two assignments of error, challenging the denial of her motion for judgment of acquittal and the trial court's finding that she violated her probation by committing the crime of hindering prosecution. In both assignments, defendant argues that the state presented insufficient evidence from which a rational trier of fact could find that defendant "[h]arbor[ed] or conceal[ed]" a person within the meaning of ORS 162.325(1)(a). We agree with defendant and, therefore, reverse and remand.

On review of the denial of a motion for judgment of acquittal, we "state the facts in the light most favorable to the state." *State v. Kaylor*, 252 Or App 688, 690, 289 P3d 290 (2012), *rev den*, 353 Or 428 (2013). Then, viewing the evidence in that light, we determine whether "a rational trier of fact could have found that the state proved all the essential elements of the offense beyond a reasonable doubt." *Id.* at 691.

Late one evening, while she was at home, Ruby Whiteley[2] saw a strange man knocking on her front door. The man then went around to her back door and attempted to get inside. Ruby went to the door and confronted the man, who told her that he was sick and needed to come inside. Ruby thought that the man looked "like he was high on something." Ruby told the man that he could not come inside because she did not know him, but she said that she would get him help by calling the police.

Sheriff's Deputies Quinn and Ramsey responded to Ruby's house; they were subsequently joined by Deputy Geist. Quinn and Ramsey found a man sitting in a car parked

---

[1] ORS 162.325(1) provides, in part:

"A person commits the crime of hindering prosecution if, with intent to hinder the apprehension, prosecution, conviction or punishment of a person who has committed a crime punishable as a felony * * * the person:

"(a) Harbors or conceals such person[.]"

[2] For clarity, we refer to Ruby Whiteley as "Ruby" and her son, Monty Whiteley, as "Monty."

in Ruby's driveway. They determined that the man was in need of medical attention and contacted paramedics. Then they discovered that the car was registered to defendant and found paperwork in the car with Monty Whiteley's name on it. Monty is Ruby's son. The deputies learned that there was a warrant for Monty's arrest for a felony probation violation.

The deputies asked Ruby if Monty was on the property that night. Ruby told them that she did not know. However, she said that she recognized defendant's car and that, because she had seen defendant with Monty in the past, she assumed that Monty was on the property. She further explained that Monty was not allowed in the house, but he had permission from her husband to stay in a shed about a hundred feet behind the house. Ruby gave the deputies permission to go back to the shed.

When the deputies arrived at the shed, they saw a power cord running under the door and heard a man and a woman talking inside. The deputies believed that Monty was in the shed and wanted to get him to come out in order to arrest him. However, because he had fled from police in the past, they also believed that Monty would not willingly leave the shed if they identified themselves as law enforcement officers.

The deputies knocked on the door of the shed, and the occupants asked who it was. Ramsey responded that they were looking for the owner of the car in the driveway. Defendant said that the car belonged to her, and Ramsey told her that he needed to talk to her about the man that they had found in the car, because he was sick and being treated by paramedics. He asked if the man had any history of medical conditions of which the paramedics should be aware, and defendant responded that she had just met the man that night and did not know his medical history. Monty said that he did not know the man in the car. Defendant and Monty did not identify themselves to the officers.

While Ramsey was talking to defendant and Monty, his portable radio broadcast the sound of the sheriff's office dispatcher, which made it obvious that he and the other deputies were law enforcement officers. At that point, the

deputies identified themselves and explained that they knew that Monty was inside and that he needed to come out because there was a warrant for his arrest. They also told defendant that she would be charged with hindering prosecution if she did not open the door, and they told Monty that, if he did not come to the door, he would be subjecting defendant to criminal charges. Further, the deputies told them that there were more officers coming and, if they did not open the door, they would force it open. However, after the radio broadcast, neither defendant nor Monty would speak to the deputies.

After about 10 to 15 minutes, the deputies returned to the house and obtained Ruby's permission to force open the door to the shed. By that time, more deputies had arrived. The deputies broke down the door and discovered defendant and Monty hiding under a blanket on a mattress inside the shed, pretending to be asleep. The deputies ordered them to come out of the shed and placed them under arrest. Defendant was subsequently charged with hindering prosecution.

Defendant was tried to a jury, and, at that trial, the state presented testimony as to the facts recounted above from Ruby, Quinn, Ramsey, and Geist. Ramsey and Geist testified that, before they broke down the door and arrested Monty, they "believed" but were not "sure" that Monty was in the shed, and that there was a "possibility" that the man in the shed was someone other than Monty.

At the close of the state's case, defendant moved for judgment of acquittal. She argued, among other things, that she could not have harbored Monty within the meaning of ORS 162.325(1)(a) because the shed was not her property. Further, according to defendant, she did not conceal Monty because the deputies already knew that Monty was in the shed. The court agreed with defendant that there was insufficient evidence to show that she concealed Monty, because the deputies knew that Monty was inside. The court therefore asked the state to focus its argument on harboring.

In response, the state asserted that defendant harbored Monty by refusing to open the door, which hindered

the deputies' ability to apprehend Monty by forcing them to break down the door in order to arrest him. The trial court denied defendant's motion for judgment of acquittal. Despite the trial court's statement that there was insufficient evidence to prove that defendant concealed Monty, the court instructed the jury on the meaning of "conceals" in ORS 162.325(1)(a), and both parties made arguments to the jury about whether defendant had hindered prosecution by concealing Monty. Defendant was subsequently found guilty of hindering prosecution.

Defendant was on probation at the time of her trial. After defendant was found guilty of hindering prosecution, she admitted to violating the terms of her probation by failing to "obey all laws." Based on her admission, the trial court found that defendant had committed that violation and continued her probation.

On appeal, the parties largely reiterate the arguments that they made in the trial court. Accordingly, to resolve this case, we must determine whether there was sufficient evidence from which a jury could reasonably find that defendant, "with the intent to hinder the apprehension, prosecution, conviction or punishment of a person who has committed a crime punishable as a felony," "[h]arbor[ed] or conceal[ed]" a person, under ORS 162.325(1)(a).

Defendant does not challenge that Monty was "a person who has committed a crime punishable as a felony." Moreover, defendant does not dispute that, by failing to unlock the door and refusing to speak to the deputies, she intended to "hinder" the "apprehension, prosecution, conviction or punishment" of Monty by making it more difficult and time-consuming for the deputies to take him into custody. Instead, she argues only that she did not "[h]arbor[]" or "conceal[]" Monty within the meaning of those terms in ORS 162.325(1)(a). That argument presents an issue of statutory construction.

We resolve statutory construction questions through an inquiry into the text, context, and legislative history of the statute. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). When statutory text includes words in common

usage, they should be interpreted in accordance with their plain, natural, and ordinary meaning. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). Further, perhaps to state the obvious, any previous construction of the statute is relevant to our analysis. *See State v. Bryan*, 221 Or App 455, 459, 190 P3d 470 (2008), *rev den*, 347 Or 290 (2009) ("Prior construction of a statute by this court is always relevant to our analysis of the statute's text.").

We previously construed "[h]arbors" and "conceals" in ORS 162.325(1)(a) in *State v. Turley*, 202 Or App 40, 120 P3d 1229 (2005), *rev den*, 340 Or 157 (2006). In *Turley*, the defendant was charged with hindering prosecution under ORS 162.325(1)(a) for harboring or concealing her husband, Silvers, who had violated his post-prison supervision (PPS) by failing to report to his PPS officer. 202 Or App at 43-45. A warrant was issued for Silvers's arrest, and two PPS officers went to the defendant's trailer, which was listed as Silvers's current residence, to serve the warrant. When one officer knocked on the door, he heard a woman respond, "Who is it?" *Id.* The officer then knocked again and identified himself, but he got no response from inside the trailer. The PPS officers, as well as police officers who responded as backup, knocked on the door several more times and stated that they were looking for Silvers and that the defendant needed to open the door. They informed the defendant that they knew Silvers was there, that they had a felony warrant for his arrest, and that the defendant could be criminally charged if someone did not come to the door. After about 10 minutes, the officers opened the door, which was unlocked, and discovered the defendant and Silvers sitting together in the back of the trailer. The defendant was convicted of hindering prosecution under ORS 162.325(1)(a). *Id.* at 45.

On appeal, the defendant asserted that there was insufficient evidence to support her conviction, because the state had failed to prove that she had committed an "affirmative act" to harbor or conceal Silvers, and that her omission—failing to open the door—could not support a conviction. *Id.* at 49. We rejected that argument.

First, we construed the terms "harbor" and "conceal" based on their dictionary definitions:

> "The word 'harbor' in the statute means 'to give shelter or refuge to : take in,' 'to receive clandestinely and conceal,' or 'to conceal a fugitive from justice.' *Webster's Third New Int'l Dictionary* 1031 (unabridged ed 2002). The word 'conceal' means 'to prevent disclosure or recognition of : avoid revelation of : refrain from revealing : withhold knowledge of : draw attention from : treat so as to be unnoticed.' *Webster's* at [469]."

*Id.* at 49. We concluded, based on those definitions, that "a rational trier of fact could find from the evidence that defendant harbored or acted to conceal from law enforcement authorities the presence of a person whom she knew to be the subject of an arrest warrant by attempting to mislead the officers into believing that the residence was unoccupied." *Id.* We further explained that the defendant's argument that harboring or concealing could not be proved by showing an omission was "at odds with the ordinary meaning" of those terms, concluding that "[a] person's failure to respond to inquiries by law enforcement authorities with the intent to induce them to believe that the fugitive is not present is as much of a harboring or concealment of that fugitive's presence as an affirmative response made to law enforcement authorities that is untruthful." *Id.* at 49-50.

Accordingly, under *Turley*, the state can prove that a person harbored and concealed a fugitive by showing that the person gave shelter to a fugitive and concealed that person, by either an act or an omission, including by remaining silent and failing to answer a door, with the intent to induce law enforcement to believe that the fugitive is not present. The state argues that *Turley* controls the outcome in this case. In the state's view, defendant harbored and concealed Monty because, by staying silent in the face of the deputies' inquiries and failing to open the door on their commands, she intended to induce them to believe that Monty was not in the shed. We disagree with the state.

On this record, a jury could not permissibly find that defendant intended to induce the deputies to believe that another person was not present in the shed. As discussed above, the law enforcement officers in *Turley* heard only a female voice before the defendant stopped speaking to them; they did not hear the fugitive speak. In contrast, here,

defendant and another person both spoke to the deputies—informing them that they did not know the medical history of the man in the car—before defendant fell silent. Thus, a jury could not reasonably find that defendant's silence and failure to open the door amounted to an attempt to convince the deputies of something they knew not to be true—that she was alone in the shed.

Defendant contends that she could not have "[h]arbor[ed]" Monty because she was his guest in the shed. The state responds that neither *Turley* nor the "common meaning of the word 'harbor'" precludes a guest from harboring his or her fugitive-host. To start, *Turley* does not resolve that issue. The question posed in this case—whether a guest can harbor a fugitive-host—was not at issue in *Turley*. There, the defendant was the owner of the trailer in which she harbored the fugitive.

As noted, *Turley* referenced three of the dictionary definitions of the term "harbor": (1) "to give shelter or refuge to: take in," (2) "to receive clandestinely and conceal," and (3) "to conceal a fugitive from justice." 202 Or App at 49 (quoting *Webster's* at 1031). Based on those definitions, we conclude that the plain meaning of harbor demonstrates that a guest cannot harbor a fugitive in the fugitive's own abode. Definitions (1) and (2) each suggest that, to harbor a fugitive, the defendant must allow the fugitive to enter a space in order to provide him or her with protection from law enforcement.[3] It would be contrary to the plain and ordinary meaning of harbor to conclude that a guest who is sheltered and received by the owner or occupant of property is—by the same action—sheltering and receiving her host. Accordingly, a jury could not permissibly find that defendant harbored Monty, because it is undisputed that defendant was a guest in the shed that was Monty's own abode.

Finally, we address whether a jury could reasonably find that defendant "conceal[ed]" Monty. As discussed above, the parties dispute whether there was sufficient evidence

---

[3] Although definition (3), "to conceal a fugitive from justice," does not necessarily carry the same connotation, it is entirely redundant with the meaning of "conceals" in ORS 162.325(1)(a). We address the meaning of conceal below.

from which a jury could reasonably conclude that the deputies did not know that Monty was the man in the shed with defendant. In their arguments, the parties assume that "conceals" in ORS 162.325(1)(a) includes preventing law enforcement from learning the identity of a person whose presence is already known. However, that premise is incorrect.

The state and defendant both rely on *Turley*, which defines "conceal" as "'to prevent disclosure or recognition of : avoid revelation of : refrain from revealing : withhold knowledge of : draw attention from : treat so as to be unnoticed.'" 220 Or App at 49 (quoting *Webster's* at [469]). Those definitions, however, are not helpful to establish whether the object of any concealment by defendant in this case— purportedly Monty's identity—is the concealment of "*a person* who has committed a crime punishable as a felony" under ORS 162.325(1)(a) (emphasis added). Put another way, what matters here is not what it means *to conceal*, but, instead, *what* is concealed.

ORS 162.325(1)(a) provides that a defendant is guilty of hindering prosecution if the defendant "conceals *such person*," referring to "a person who has committed a crime punishable as a felony." ORS 162.325(1)(a) (emphasis added). ORS 161.015(5) defines "person," for purposes of ORS 162.325, to mean "a human being." Thus, to prove that a defendant hindered prosecution by "conceal[ing]" a "person" who is a fugitive, the state must present evidence from which a jury could reasonably conclude that the defendant concealed an actual human being, *i.e.*, that person's physical presence. Concealing the identification of that person, but not the actual human being, is not "conceal[ing] *** such person" under ORS 162.325(1)(a).

The broader context of ORS 162.325(1)(a) reinforces that understanding. In particular, ORS 162.325(1)(d) provides that a defendant is guilty of hindering prosecution if he or she "[p]revents or obstructs, by means of force, intimidation or *deception*, anyone from performing an act which might aid in the discovery or apprehension of such person[.]" (Emphasis added.) The type of conduct that the parties presume would violate ORS 162.325(1)(a)—attempting to deceive the police into believing that a person is someone other than the fugitive—would likely violate ORS 162.325(1)(d).

We generally construe statutes to avoid surplusage or redundancy. *See* ORS 174.010 ("[W]here there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."). To that end, it is reasonable to read ORS 162.325(1)(a) and ORS 162.325(1)(d) to have distinctly different meanings. Thus, we conclude that the legislature intended that "conceal[ing]" a person involves something other than attempting to obscure his or her identity through deception.

Here, the state did not present sufficient evidence that defendant concealed Monty's physical presence when, after Monty disclosed his presence by speaking with the deputies, defendant subsequently refused to speak to the deputies or to open the door. Regardless of how certain the deputies were that the man in the shed with defendant was Monty, they were aware that a man was present in the shed because that man spoke to them. Defendant might have failed to provide the police with information about Monty's identity, but she did not conceal his personage. Accordingly, a reasonable jury could not find that defendant concealed a person who was a fugitive.

Although defendant might have intended to make it more difficult for the deputies to arrest Monty by refusing to cooperate with them, thereby "hindering" their apprehension of Monty, ORS 162.325(1)(a) does not criminalize all uncooperative conduct. Instead, under that statute, the defendant's conduct must amount to actually "[h]arbor[ing]" or "conceal[ing]" a person who has committed a crime punishable as a felony. Because there was insufficient evidence from which a jury could find that defendant either harbored or concealed Monty, the trial court erred in denying defendant's motion for judgment of acquittal. Further, because the trial court's finding that defendant violated her probation was predicated on the guilty verdict for hindering prosecution, the trial court also erred in finding defendant in violation of her probation.

Reversed and remanded.