Argued and submitted January 11; affirmed on petition, reversed in part and
remanded on cross-petition March 3; petition for review denied July 8, 2021
(368 Or 347)

1000 FRIENDS OF OREGON,
*Petitioner*
*Cross-Respondent,*
*and*

Robert POWELL,
James Sterlin, and Linda Lacey,
*Intervenors-Petitioners below,*
*v.*

CLACKAMAS COUNTY,
*Respondent,*
*and*

Mark HERKAMP,
*Respondent*
*Cross-Petitioner.*

Land Use Board of Appeals
2020051; A174968

483 P3d 706

The Land Use Board of Appeals (LUBA) remanded Clackamas County's
order granting a conditional use permit to the applicant to host events as a "home
occupation" within the meaning of ORS 215.448 on property zoned for exclusive
farm use (EFU). LUBA affirmed a hearings officer's determinations that the
applicant would qualify as the "operator" of the proposed home occupation and
that no more than five persons would be employed on the site of the home occu-
pation, as required by ORS 215.448. However, LUBA remanded to the county on
the grounds that the applicant's proposed renovations to existing barns on the
property, and proposed construction of a new restroom building to serve up to
300 guests, were more extensive than is permitted for a home occupation under
that statute. 1000 Friends of Oregon petitioned for judicial review of LUBA's
order, arguing that LUBA erred by affirming the hearings officer's decision on
the applicant's status as an operator and the five-person limitation. The appli-
cant cross-petitioned for review of the two issues on which LUBA had remanded
to the county—the renovation of the barns and the construction of the restroom
building. *Held*: With regard to the petition, LUBA's order was not based on a
misinterpretation of the five-person limit in ORS 215.448(1)(b) or the operator
requirement in ORS 215.448(1)(a). As for the cross-petition, LUBA's conclusion
as to the character of one of the barns was so at odds with the evidence that the
Court of Appeals concluded that LUBA had misunderstood or misapplied the
substantial evidence standard. However, LUBA did not err in the other ways
identified by the applicant.

Affirmed on petition; reversed in part and remanded on cross-petition.

Andrew Mulkey argued the cause and filed the briefs for petitioner-cross-respondent.

Tyler Smith argued the cause and filed the briefs for respondent-cross-petitioner.

Carol Macbeth filed the brief *amicus curiae* for Central Oregon LandWatch.

No appearance for respondent Clackamas County.

Before Lagesen, Presiding Judge, and James, Judge, and Hadlock, Judge pro tempore.

JAMES, J.

Affirmed on petition; reversed in part and remanded on cross-petition.

**JAMES, J.**

This case involves a decision by the Land Use Board of Appeals (LUBA) that remanded Clackamas County's order granting a conditional use permit to the applicant, Mark Herkamp, to host events as a "home occupation" within the meaning of ORS 215.448 on property zoned for exclusive farm use (EFU). LUBA affirmed a hearings officer's determinations that Herkamp would qualify as the "operator" of the proposed home occupation and that no more than five persons would be employed on the site of the home occupation, as required by ORS 215.448. However, LUBA remanded to the county on the grounds that Herkamp's proposed renovations to existing barns on the property, and proposed construction of a new restroom building to serve up to 300 guests, were more extensive than is permitted for a home occupation under that statute.

1000 Friends of Oregon petitioned for judicial review of LUBA's order, arguing that LUBA erred by affirming the hearings officer's decision on Herkamp's status as an operator and the five-person limitation. Herkamp cross-petitioned for review of the two issues on which LUBA had remanded to the county—the renovation of the barns and the construction of the restroom building. For the reasons explained below, we reverse LUBA's final order as to the renovation of one of the barns, but we otherwise affirm on the petition and cross-petition.

## I.  BACKGROUND

We draw the pertinent background facts from LUBA's final order and from undisputed evidence in the record. The property at issue, located south of Oregon City in Clackamas County, is approximately 12.5 acres and is zoned EFU. In addition to an existing residence, there are two barns on opposite corners of the property: a lower barn in one corner and an upper barn in another. Herkamp applied to the county for a conditional use permit to allow him to host events on the property as a "home occupation."

"Home occupations" are among the exceptions to the general prohibition on nonfarm uses in EFU zones. *See* ORS 215.283(2) ("The following nonfarm uses may be

established, subject to the approval of the governing body or its designee in any area zoned for exclusive farm use subject to ORS 215.296: \*\*\* (i) Home occupations as provided in ORS 215.448."). The standards for home occupations are set forth in ORS 215.448(1):

> "(a)  It shall be operated by a resident or employee of a resident of the property on which the business is located;
>
> "(b)  It shall employ on the site no more than five full-time or part-time persons;
>
> "(c)  It shall be operated substantially in:
>
> "(A)  The dwelling; or
>
> "(B)  Other buildings normally associated with uses permitted in the zone in which the property is located; and
>
> "(d)  It shall not unreasonably interfere with other uses permitted in the zone in which the property is located."

ORS 215.448(3) further provides that "[n]othing in this section authorizes the governing body or its designate to permit construction of any structure that would not otherwise be allowed in the zone in which the home occupation is to be established."

Herkamp's proposed plans for the "home occupation" included renovating the two existing barns to accommodate event use. The upper barn was the smaller of the two, and the proposed renovation would create space for small meetings and ancillary spaces ("brides and grooms" rooms) that could be used in conjunction with larger events held outside or in the lower barn. The renovation also would add two single-user ADA restrooms to that barn.

The lower barn, which was much larger, was framed on top of naturally sloped dirt, and the walls did not extend to the ground. Herkamp's proposed renovation included a new entry vestibule, emergency exit doors, and six large garage-style doors along the building's sides. He also proposed new siding, weatherization, and soundproofing; a floor for dancing; a catering preparation area with sink but no cooking equipment; a service entrance; a patio; and a parking lot.

In addition to those renovations, Herkamp proposed a separate new building for two restrooms to serve the lower barn, with new septic and water systems with a capacity to serve up to 300 people. One of the restrooms had two toilet stalls, and the other had a toilet stall and a urinal. Each restroom had two sinks.

A hearings officer for the county received testimony at a public hearing on the application, including opposition from 1000 Friends. Among other things, 1000 Friends asserted that the renters, not Herkamp nor his employees, would be "operating" the events for purposes of ORS 215.448(1)(a); that events on the property would employ more than five persons on site in violation of ORS 215.448 (1)(b); that the proposed restroom building was not the kind of structure allowed in an EFU zone; and that the extent of the renovations of the barns converted them into commercial dance and banquet halls—buildings that are not normally associated with uses permitted in the EFU zone.

The hearings officer ultimately approved the application, with certain conditions. 1000 Friends then appealed that decision to LUBA, arguing that the hearings officer misconstrued the "operator" requirement in ORS 215.448 (1)(a) and the five-person limit for home occupations in ORS 215.448(1)(b), and that the extensive renovations and the restroom building violated ORS 215.448(3) (nothing in home occupation provision authorizes "construction of any structure that would not otherwise be allowed in the zone").

LUBA rejected the assignments of error regarding the operator and five-person requirements, but it agreed with 1000 Friends about the extent of the renovations and new construction. LUBA further concluded that, "because it may be possible for the county to approve the home occupation without the extensive renovations and construction elements for the barns and additional restroom building, remand is the appropriate remedy."

Neither side was wholly satisfied with that decision. 1000 Friends seeks judicial review of LUBA's order regarding the operator and five-person requirements under ORS 215.448(1). Herkamp seeks judicial review of LUBA's

conclusion that the barn renovations and restroom construction violate ORS 215.448(3).

## II.   DISCUSSION

### A.   *Petition for Review*

We begin with the issues presented in 1000 Friends' petition. In doing so, we review LUBA's order to determine whether it is unlawful in substance, ORS 197.850(9)(a), and do not substitute our judgment for LUBA's as to any factual issue, ORS 197.850(8).

Both of the issues presented in 1000 Friends' petition challenge LUBA's construction of ORS 215.448, which is something we review "for legal error, employing the methodology described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009)." *Central Oregon LandWatch v. Deschutes County*, 285 Or App 267, 276-77, 396 P3d 968 (2017). Our role in interpreting ORS 215.448 is to determine the meaning of the provision at issue that the enacting legislature most likely intended, which we do by examining the statutory "text, in context, and, where appropriate, legislative history and relevant canons of construction." *Chase and Chase*, 354 Or 776, 780, 323 P3d 266 (2014). As part of that inquiry, we consider any previous construction of the statute by Oregon appellate courts. *See State v. Hutchins*, 281 Or App 495, 501, 383 P3d 399 (2016).

### 1.   *Prior construction of ORS 215.448*

The petition for review by 1000 Friends is directed at LUBA's interpretation and application of ORS 215.448 (1)(a) and (b). Because neither LUBA nor this court is writing on a blank slate with regard to that statute, we begin with a discussion of an earlier event-hosting application. In *Green v. Douglas County*, 63 Or LUBA 200 (2011) (*Green I*), LUBA considered an application for a home occupation in which "[t]he actual production of the events (conducting ceremonies, preparation of food and drinks, playing recorded music and other entertainment and parking management) is provided by caterers and other contractors, not by intervenors or employees of intervenors." 63 Or LUBA at 204. LUBA suggested in *dicta* that an arrangement like that

would "appear to" violate the "operator" requirement in ORS 215.448(1)(a):

> "The 'It' referred to in ORS 215.448(1)(a) and (b) is intervenors' home occupation. Under ORS 215.448(1)(a) the home occupation must be operated by 'a resident or employee of a resident.' *Intervenors are the residents and as far as we are informed they have not operated and will not operate the event-site home occupation, and intervenors have no employees and do not intend to hire employees to produce events on the site.* Assuming as we do that the 2010 CUP permits intervenors' home occupation to operate in that manner, *it would appear to violate the ORS 215.448 (1)(a) requirement that intervenors event-site home occupation must be operated by intervenors and their employees.*"

*Id.* at 224 (emphases added). However, the "operator" issue had not been raised by the petitioners, who had focused instead on the five-person limit in ORS 215.448(1)(b). *Id.* ("We therefore do not consider that question [under paragraph (a)] and turn to the five 'person' limit in ORS 215.448(1)(b).").

Turning to the petitioner's challenge to the five-person limit, LUBA disagreed with the county's distinction between the use of independent contractors and employees on the site:

> "We agree with petitioners that as ORS 215.448(1)(b) is worded, its five person limit is not so easily avoided. The 'it' in ORS 215.448(1)(b) is intervenors' event-site home occupation. Under ORS 215.448(1)(b), that event-site home occupation may not 'employ' more than 'five persons.' Intervenors event-site home occupation 'employs' the persons who are required to produce events on the site, within the meaning of ORS 215.448(1)(b), whether they are intervenors' employees or independent contractors or whether they are the employees or independent contractors of the attendees of the events. In either case the event-site home occupation employs those persons to produce the event."

63 Or LUBA at 224-25 (footnote omitted). LUBA's opinion referenced the *Webster's* definition for "employ," which includes "**1a** : *to make use of* **b** : to use or occupy (as time) advantageously **c** : *to use or engage the services of*; also : to provide with a job that pays wages or a salary or with a means of earning a living **d** : to devote to or direct toward a

particular activity or person **e** : OCCUPY." *Webster's Third New Int'l Dictionary* 743 (unabridged ed 1981), *quoted in Green I*, 63 Or LUBA at 225 n 26 (emphases added).

The petitioners sought judicial review of that decision. In a published opinion, we affirmed LUBA's decision with regard to ORS 215.448(1) and, without further elaboration, expressly adopted LUBA's analysis of the meaning of the word "employ." *See Green v. Douglas County*, 245 Or App 430, 442, 263 P3d 355 (2011) (*Green II*) ("For the reasons set forth in LUBA's opinion, *Green v. Douglas County*, 63 Or LUBA 200, 216-25 (2011), we agree with its conclusions on the meaning of 'substantially' and 'employ' under ORS 215.448(1)."). However, we disagreed with LUBA on other unrelated issues, so we remanded the decision to LUBA. *Green II*, 245 Or App at 432.

On remand, LUBA noted that our decision had not disturbed its conclusion that contractors can be "employed" for purposes of the five-person requirement. *Green v. Douglas County*, 67 Or LUBA 234, 244 (2013) (*Green III*). However, LUBA then proceeded to address an additional argument that the county raised on remand specifically about what it means to be employed "on the site." Because LUBA's analysis in *Green III* directly informed its decision in this case, we recite it at length:

"In one respect, ORS 215.448(1)(b) appears to be unambiguous. Under ORS 215.448(1)(b) it would appear that a home occupation in an EFU zone could employ an unlimited number of full-time and part-time persons, so long as those persons are employed off-site rather than 'on the site.' The ambiguity in ORS 215.448(1)(b) concerns persons who are employed on the site, and more specifically the ambiguity in ORS 215.448(1)(b) is limited to determining how to count persons who are employed part-time on the site, since any employee who is employed full-time on the site would clearly count as one of the five persons permitted by ORS 215.448(1)(b).

"* * * * *

"Under the planning commission's interpretation, more than five different persons could be employed on the site, so long as no more than five persons are employed on the site at the same time.

"Petitioners contend ORS 215.448(1)(b) limits the number of persons who are employed on the site, whether they are employed on the site 'full-time or part-time.' Under petitioners' interpretation of ORS 215.448(1)(b) a person who is employed on the site for one hour would count as one of the five persons ORS 215.448(1)(b) permits the home occupation to employ on the site, and any part-time person who was employed on site for one hour that day after the first person left would count as another of the five persons ORS 215.448(1)(b) permits. * * *

"Both petitioners' interpretation and the planning commission's interpretation is possible, because ORS 215.448 (1)(b) does not specify the period of time that the five person limit is to be applied. * * *

"* * * * *

"We doubt the legislature envisioned home occupations like the one at issue in this appeal. We also doubt the legislature considered the possibility that home occupations would employ potentially large numbers of persons who would shuttle onto and off of the site. The legislature likely intended the five person limit to apply at any given point in time (the planning commission's position) or per day (petitioners' position), as opposed to per week, per month or per year. But the statute is simply silent about the period of time that the five person limit is applied to. Although it is a reasonably close call, we conclude the planning commission's interpretation is at least as consistent with the language of ORS 215.488(1)(b) as petitioners'. Under the planning commission's interpretation all that is required is to count the number of persons who are employed on the site at any given time. In our view, that interpretation requires less embellishment of the statute than petitioners' interpretation."

*Green III*, 67 Or LUBA at 244-46.

   2.   *"Employ on the site" no more than five persons*

       With that backdrop, we turn back to the issues raised by 1000 Friends on judicial review, beginning with their argument that LUBA, relying on the same reasoning articulated in *Green III*, misinterpreted the requirement that the home occupation "shall employ on the site no more than five full-time or part-time persons" in ORS 215.448(1)(b).

According to 1000 Friends, the "five-employed-person limit applies regardless of whether the people employed would be on the site at the same time. The text acts as a total and absolute limit on the number of people employed on site by a home occupation." Herkamp, on the other hand, argues that the statute should not be applied in a way that counts offsite persons hired to put on the events or persons who have done so in the past, and that LUBA correctly determined that he will not employ more than five persons on the site at any one time.

Rather than repeat LUBA's analysis, which essentially readopted the analysis in *Green III*, we supplement it to explain why we agree that the five-person requirement limits a home occupation to five persons *concurrently* employed on the site and reject 1000 Friends' narrower construction.

As LUBA has pointed out, ORS 215.448(1)(b) does not say when or how the five-person snapshot is taken—at any particular moment, per day or per month or per year, or for all time. The most straightforward reading of the text is that ORS 215.448(1)(b) does not permit a home occupation to "employ on the site" more than five persons simultaneously. We previously construed the word "employ" for purposes of ORS 215.448(1) to reach beyond employer-employee relationships and to include independent contractors as well. *Green II*, 245 Or App at 442 (adopting *Green I*, 63 Or LUBA at 224-25). In doing so, we interpreted the term consistently with its ordinary meaning in the context of employing persons with respect to a business, which is to "'use or engage the services of'" a person. *Green I*, 63 Or LUBA at 225 n 26 (quoting *Webster's* at 743); *Green II*, 245 Or App at 442 (adopting that interpretation).

In light of that prior construction, the phrase "employ on the site" refers to using or engaging the services of persons on the site to carry out the home occupation business. And, we can draw two additional conclusions from that text. The first is that the verb "employ" is in the present tense, suggesting an ongoing or current use or engagement rather than past or future use or engagement of services. *Martin v. City of Albany*, 320 Or 175, 181, 880 P2d 926 (1994) ("The use of a particular verb tense in a statute can

be a significant indicator of the legislature's intention."). In other words, the text supplies no reason to believe that the limit was intended to reach back to count persons who were employed or used in the past to operate a business.

Second, by implication, the phrase "employ *on the site*" suggests that a home occupation can employ additional full- or part-time persons at other locations to carry out aspects of the home business. (Emphasis added.) The legislative history of the statute confirms what the text suggests in that regard. The phrase "on the site" was added in 1995, and it clarified that a home occupation, such as a construction company, could employ additional persons away from the site and still meet the five-person requirement. Tape Recording, House Committee on Natural Resources, Subcommittee on Energy and Environment, HB 2561, Apr 19, 1995, Tape 67, Side B, 34:50-35:25 (statement of Mr. Van Natta presenting amendments to the committee) ("[W]e added to the existing language 'on the site.' And that was really designed to facilitate people such as those in the building businesses who maybe kept their books at home but who employed people off the site.").

Considering those features of the text and its history, we agree with LUBA's conclusion that the five-person limit refers to persons who are presently used for or engaged in services on the site for the home occupation. It is not, as 1000 Friends contends, a "total and absolute limit on the number of people employed on site by a home occupation."

The hearings officer found that it was feasible for Herkamp to staff events with no more than five persons on the site at one time, and LUBA determined that there was substantial evidence to support that finding. We are not persuaded that LUBA's determination was based on a misinterpretation of ORS 215.448(1) or that it was otherwise unlawful in substance.[1]

---

[1] 1000 Friends poses a hypothetical in which scores of part-time employees are shuttled on and off the premises so that no more than five are physically on the site at any one time. LUBA's analysis suggested that such an arrangement would comply with the limit. However, for purposes of this case, we need not explore the outer bounds of what constitutes being "employ[ed] on the site," or address whether permanent part-time employees may be considered, under some circumstances, to be employed on the site even at moments when they are

### 3. *"Operated by a resident or employee of a resident"*

We turn next to 1000 Friends' contention that Herkamp's events will not be "operated by a resident or employee of a resident" as required under ORS 215.448(1)(a). According to 1000 Friends, the event hosting will be operated "entirely, if not in large part, by the people who rent the venue and who are neither residents nor employees of a resident." That, 1000 Friends argues, is the view of the term "operated" that LUBA espoused in *dicta* in *Green II* and that LUBA should have adopted in this case.

Regardless of what LUBA said in the context of an undeveloped issue in *Green II*, we agree with its construction of the statute in this case. The plain meaning of the term "operate," in the context of "operating" a business, is to "manage and put or keep in operation whether with personal effort or not < operated a grocery store >." *Webster's* at 1581; *see also id.* (defining an "operator," in part, as "a person that actively operates a business (as a mine, a farm, or a store) whether as owner, lessor, or employee"). Given that ordinary meaning, and the absence of any context or legislative history that suggests a different meaning of that term, we agree with LUBA's conclusion in this case that evidence that "the applicant is responsible for operational matters such as maintaining the event calendar and monitoring noise and sign removal" is "evidence upon which a reasonable person would rely to conclude that the applicant will operate the home occupation."[2]

---

not physically present. In this case, Herkamp proposed to use no more than five persons total for an event, which he asserted could be "achieved by scheduling of activities," including "[a]ll food preparation will be done off site, with minimal final prep done on-site," and buffet style services to eliminate the need for most servers; he represented that "[p]lanning and arrangements will be made in advance to control and limit the event to match the capability of any 5 persons that have to work on the event." For that reason, we need not opine on how shuttling part-time or full-time employees onto the site would be treated under the statute. To the extent that there is a loophole in ORS 215.448(1)(a) for shuttling employees on and offsite, that may be a matter best addressed by the legislature.

[2] In an *amicus* brief, Central Oregon LandWatch raises a separate issue, which is whether Clackamas County's zoning ordinance for "event hosting," ZDO 806, must be interpreted narrowly to encompass only those commercial events on EFU land that are related to or supportive of agriculture under ORS 215.283 (4)(a). Although there appears to be some tension between the county's broad "event hosting" ordinance for home occupations and the more limited exception

B.  *Cross-Petition for Review*

In his cross-petition, Herkamp challenges LUBA's decision to remand in two respects. First, he argues that LUBA improperly substituted itself as the factfinder in determining that the proposed alterations to the barns would change their character. Second, he argues that LUBA erred in its treatment of the proposed restroom building near the lower barn.

1.  *Character of the barns*

Herkamp's first assignment of error requires us to consider LUBA's application of the substantial evidence rule to the hearings officer's finding that the proposed modifications to the lower and upper barns "would hardly change their identification as barns." In doing so, we review "LUBA's application of the substantial evidence rule for legal correctness and do not review the evidence independently for substantiality." *Columbia Pacific v. City of Portland*, 289 Or App 739, 756, 412 P3d 258, *rev den*, 363 Or 390 (2018) (internal quotation marks, citation, and brackets omitted). Thus, "where LUBA properly articulates the substantial evidence standard of review, we will affirm unless the evidence is so at odds with LUBA's evaluation that we can infer that LUBA misunderstood or misapplied the proper standard." *Id.* (internal quotation marks, citation, and brackets omitted). Applying that standard, we agree with Herkamp that LUBA erred in remanding the hearings officer's decision regarding the renovations to the lower barn but affirm with regard to the upper barn.

At the county level, 1000 Friends argued that Herkamp was transforming the existing barns into event centers. The hearings officer rejected that claim, finding that, "[w]hile the applicant proposes to improve the barns by adding [] hard floors (rather than dirt) and sound/water

_____

in ORS 215.283(4) for an "agri-tourism or other commercial event or activity," neither of the parties to this judicial review has assigned error to any determination by LUBA on that issue, so we do not further address it. *See Cox v. Polk County*, 174 Or App 332, 342 n 9, 25 P3d 970, *rev den*, 332 Or 558 (2001) ("*Amicus* Oregon Farm Bureau Federation contends that the proposed project is not a farm use under ORS 215.203. However, the parties to this case do not assign error to LUBA's conclusion that the project is a farm use. Accordingly, we do not address that question.").

proofing[,] that would hardly change their identification as barns." LUBA, however, reversed that finding:

> "[W]e agree that changes to the lower barn with a dance floor, sound proofing, and an area described in the application narrative as catering preparation area (without cooking equipment) *is an extensive renovation that changes the character of the building* and is therefore not allowed by ORS 215.448(3) [(providing that "[n]othing in this section authorizes the governing body or its designate to permit construction of any structure that would not otherwise be allowed in the zone in which the home occupation is to be established")]. The upper barn renovations add restrooms and "Brides and Grooms rooms"; the floor plan does not show the existing barn horse stalls or other barn features and we assume they are proposed to be eliminated. *We agree with petitioner that the upper barn renovations also violate ORS 215.448(3)*."

(Emphases added.)

After reviewing the record, we agree with Herkamp that LUBA's conclusion as to the character of the lower barn is so at odds with the evidence that we can infer that LUBA misunderstood or misapplied the substantial evidence standard and instead substituted itself as factfinder. The evidence in the record is that the proposed "catering preparation area" is a walled off area in the corner of the structure. The structure itself is approximately 100 feet by 34 feet, or 3400 square feet. The walled off preparation area is approximately 10 feet by 25 feet, or 250 square feet—approximately seven percent of the structure. The evidence regarding the dance floor is that it will be a "hard floor" as opposed to the existing dirt, and the plans show a "slab." In short, there is nothing about any of the proposed changes identified by LUBA—the floor, the relatively small prep area, or soundproofing—that indicate that the building would no longer look like a barn, would no longer be usable as a barn, or would lose its "character" as a barn, nor is there anything in the record to indicate, as LUBA suggests, that a barn that includes a hard floor, small prep area, and soundproofing would not be allowed in an EFU zone even where all of its other features are those of a barn. Instead, LUBA appears to have substituted its own judgment about the character of

that barn rather than assessing whether there was evidence to support the hearings officer's contrary finding. We therefore agree with Herkamp that LUBA erred in remanding to the county based on proposed modifications to the lower barn, and we reverse that aspect of LUBA's final order.

We reach a different conclusion as to the upper barn. Although Herkamp's arguments on judicial review sometimes refer to both barns, he represented at oral argument that he does not independently challenge LUBA's treatment of the upper barn. To the extent that he is raising arguments as to that barn, we reject them. In his briefing to LUBA, Herkcamp referred to the upper barn as his "horse stall barn" or "horse stalls barn." LUBA determined that the proposed plans for that smaller structure (864 square feet) showed renovations to divide up the structure for space for small meetings and to accommodate ancillary spaces (bride and groom rooms), and to add two bathrooms (an additional 124 square feet), but the plans showed no horse stalls or other barn features. Regardless of whether we would reach the same conclusion as LUBA in the first instance, we cannot say that LUBA's determination about the change in character of that barn, in light of the plans submitted and the briefing before LUBA, was based on a misunderstanding of the substantial evidence standard.

   2.   *Restroom building*

Last, we consider Herkamp's second assignment, in which he contends that LUBA erred in overturning the hearings officer's determination concerning the additional restroom building proposed near the lower barn. The hearings officer determined that the restrooms were "'uses and structures customarily accessory and incidental to a dwelling'" and therefore "other buildings which are normally associated with uses permitted" in the EFU zone. On that issue, LUBA disagreed, reasoning:

> "Although restrooms are a common component of modern dwellings, the new restroom building and its associated septic field are needed to provide ADA compliant restrooms and septic systems to accommodate up to 300 people at a time for a non-residential and non-agricultural use. There is no evidence to support a conclusion that the restroom

building is accessory to the existing dwelling. Moreover, there is no evidence in the record that a free-standing restroom with the septic system capacity to serve 300 people per event is a structure or use customarily associated with a dwelling on EFU land."

(Emphasis omitted.)

As we understand Herkamp's assignment of error, it is that LUBA failed to appreciate that a restroom building is "permitted outright and it is an allowed use" in the EFU zone. For that reason, Herkamp contends, LUBA's order is unlawful in substance because it failed to defer to the county's interpretation of what is allowed as an "accessory" structure under its own code. *See Siporen v. City of Medford*, 349 Or 247, 261, 243 P3d 776 (2010) ("A LUBA decision is 'unlawful in substance' (in at least one way) if, in contravention of the standard of review set out at ORS 197.829(1), LUBA substitutes its own interpretation of a local government's land use regulations for a plausible interpretation of those regulations offered by the local government.").

We disagree with Herkamp's contention that the county interpreted its own code in this case in a way that would require any deference. Even assuming that the hearings officer's interpretation could qualify,[3] the hearings officer did not reference a relevant code provision, let alone interpret one, and Herkamp has not cited any code provision that could plausibly be interpreted to mean that *any* restroom building, of *any* size, shape, use, and location on the property, is permitted outright as an accessory to a dwelling.

Rather, we understand LUBA to have concluded that the hearings officer's decision that *this* restroom structure was "accessory" to a dwelling was not supported by substantial evidence. As described above, our review in that context is for legal correctness of LUBA's application

---

[3] *But see Tonquin Holdings, LLC v. Clackamas County*, 247 Or App 719, 722, 270 P3d 397, *rev den*, 352 Or 170 (2012) ("In contrast [to *Siporen* deference accorded to a local government's interpretation of its *own* zoning ordinance], on review of a local government land use *hearings officer's* interpretation of a local code provision, there is no deference accorded to the interpretation." (Emphasis in original.)).

of the substantial evidence standard; we do not review the evidence independently for substantiality. *Columbia Pacific*, 289 Or App at 756. Under that deferential standard, we cannot say that LUBA's determination—that there was no evidence in the record that a freestanding restroom building of this type, with septic capacity for accommodating up to 300 people, is a structure accessory to a dwelling or customarily associated with a dwelling on EFU land—is so at odds with the evidence that it reflects a misunderstanding of the substantial evidence standard of review. For that reason, we reject Herkamp's second assignment of error.[4]

### III.   CONCLUSION

For the foregoing reasons, we reverse and remand LUBA's order to the extent that LUBA determined that proposed renovations to the lower barn would violate ORS 215.448(3). We affirm LUBA's decision with regard to all other issues raised in the petition and cross-petition.

Affirmed on petition; reversed in part and remanded on cross-petition.

---

[4] We reject without discussion the remaining contentions that Herkamp advances with regard to LUBA's handling of issues related to the restroom building.